**In re Honorable Tony JIMENEZ, Judge of County Court at Law Number Seven of Bexar County.**

Special Court of Review,
Appointed by the Supreme Court.

Nov. 16, 1992.

Mark Stevens, Stephanie L. Barclay, San Antonio, for Judge Tony Jiminez.

Robert C. Flowers, Ravelle Neary, William E. Hornung, Austin, for State Com'n on Judicial Conduct.

## OPINION

COHEN, Justice.

When a police officer called a judge's decision "chickenshit,"[1] it launched a remarkable series of events resulting in a police officer being accused of unprofessional conduct, perjury, and racial discrimination; a judge being admonished for violating rules of ethics; and ultimately, this appeal. This special court of review was appointed pursuant to TEX.GOV'T CODE ANN. § 33.034 (Vernon 1988) to conduct a trial *de novo* of the Texas Commission on Judicial Conduct's charges against the Honorable Tony Jimenez, Judge of County Court at Law Number Seven of Bexar County. The Commission privately admonished Judge Jimenez for violating Canon 2 B of the Code of Judicial Conduct, which provides, "A judge should not lend the prestige of his ... office to advance private interests of himself...." TEXAS SUPREME COURT CODE OF JUDICIAL CONDUCT, Canon 2, subd. B (1974) [hereinafter TEX.CODE OF JUDICIAL CODE]. The Commission found Judge Jimenez had "a private interest in retaliating" against San Antonio Police Officer Michael

---

1. Chickenshit: "Feces of a species of the poultry variety." Justice Ben Z. Grant and Larry L. King, *The Kingfish,* 62, Southern Methodist University Press (1992).

Heim because Heim called one of the judge's decisions "chickenshit" and that Judge Jimenez used his judicial office "to bring notoriety to (his) opinion about Officer Heim," in violation of Canon 2 B.

We find that Judge Jimenez's statements accusing Heim of perjury and selective prosecution were allowed by Canon 4 B of the Code. TEX.CODE OF JUDICIAL CONDUCT, Canon 4, subd. B (1974). Moreover, the Commission has not convinced us that any of Judge Jimenez's statements were motivated primarily by a private interest in retaliating against Heim for his criticism. Thus, we find Judge Jimenez not guilty of the charges against him.

## PROCEDURAL MATTERS

█ The Commission issued its sanction on July 10, 1992, and Judge Jimenez timely appealed. TEX.GOV'T CODE ANN. § 33.-034(b). On August 10, Texas Supreme Court Chief Justice Phillips appointed us to preside. TEX.GOV'T CODE ANN. § 33.034(c).

By agreement, the Commission filed its charging document on August 31, 1992. TEX.GOV'T CODE ANN. § 33.034(d). That document included a new charge against Judge Jimenez, one that had not been heard by the Commission. The new charge alleged the judge had violated TEX.PENAL CODE ANN. § 36.06 (Vernon 1989) by threatening Suzanne Hildebrand with retaliation because of her service as a witness, prospective witness, or informant. Ms. Hildebrand swore that the judge "alluded to the fact that I should mind my own business and stay out of the Heim affair because my husband could lose a lot of court appointments if I didn't." The Commission received Ms. Hildebrand's charge on June 9, 1992, only three days before Judge Jimenez's appearance there. The Commission did not hold a hearing on Ms. Hildebrand's allegations then because Judge Jimenez had not had time to respond.

We set the case for trial *de novo* on September 18, in compliance with the requirement that the case be tried within 30 days of the date the charging document

was filed. TEX.GOV'T CODE ANN. § 33.-034(h).

Judge Jimenez moved to strike the new allegation. He asserted two reasons: 1) Hearing the new allegation in the special court of review would deprive him of his valuable statutory right to be heard before the Commission on those charges; and 2) the new allegations constituted a new ground of recovery that was not pleaded before the Commission, a procedure specifically prohibited by TEX.R.CIV.P. 574a. We granted the motion to strike on both grounds. We hold that, although the new allegation was factually connected with the controversy heard before the Commission, it was sufficiently different in its facts, its timing, its witnesses, and its legal basis that it constituted new matter, in violation of TEX.R.CIV.P. 574a.[2] In addition, we hold that hearing the new allegation before the special court of review would deprive Judge Jimenez of his valuable statutory right to have the new matter adjudicated in the first instance by the Commission. We express no opinion whatever on the merits of Ms. Hildebrand's allegation, and nothing in this opinion prejudices the Commission's right to proceed against Judge Jimenez on that allegation.

## FACTS

On October 2, 1991, Judge Jimenez heard the defendant's motion to suppress evidence in County Criminal Court at Law Number Seven of Bexar County, in *The State of Texas v. John A. Ramos*, no. 482359. Ramos was charged with driving while intoxicated. The main State's witness at the hearing was San Antonio Police Department Officer Michael Heim, the arresting officer. Heim left before Judge Jimenez announced his ruling. Ramos contended that evidence was seized in an illegal arrest. Judge Jimenez granted the motion to suppress. The case was dismissed.

That afternoon, Officer Heim phoned Abel Trevino, who was the coordinator of court number seven and a social acquaintance of Officer Heim. During their conversation, Trevino told Heim the case had

2. Rule 574a is applicable to the present appeal by virtue of TEX.GOV'T CODE ANN. § 33.034(e).

been dismissed. Heim stated that was a "chickenshit" decision. Heim said nothing else about the case or about Judge Jimenez, and after that comment, Heim and Trevino "just talked about some general matters."

On October 3, Trevino told Judge Jimenez of Heim's statement. Judge Jimenez had Mr. Trevino testify under oath in open court under cause no. 482359 about the phone conversation. The judge stated he would write the Chief of Police, asking that the department "do something with respect to (Heim's) commentary." Assistant District Attorney Robert Lipo was in the courtroom and asked that Judge Jimenez furnish the District Attorney's office a copy of the letter.

On October 10, 1991, Judge Jimenez wrote to the chief of police and sent a copy to the District Attorney. In the letter (attached as Appendix 1), Judge Jimenez stated:

> I take particular offense to this comment and find that this raises a question as to the professionalism of Officer Heim. This court has always treated law enforcement with the utmost in courtesy and professionalism and I will not allow this comment to go unchallenged. I would hope that after you review the enclosed transcript your office will take the appropriate personnel actions as may be required under San Antonio Police Department policy. Please advise me as to your decision in this matter.

Judge Jimenez received no response. On October 29, he wrote again to the chief of police. (Appendix 2) Judge Jimenez informed the chief that he had instructed the District Attorney's office to transfer from his docket any cases involving Officer Heim as the arresting officer. In addition, he accused Heim of giving false testimony under oath in court and of racial discrimination by selectively prosecuting Hispanic males for DWI. He stated:

> Officer Heim has lost credibility with this court. I found his comment on a prior ruling of this court to be inappropriate and objectionable. I have found that his testimony in every DWI case contains the same factual circumstances, leading me to believe that he is not being honest in his responses to questions propounded to him. Further, and even more troubling, is the fact that his initial stops appear to be selectively directed against minorities, specifically Hispanic males, who are arrested under the same or similar circumstances.

Judge Jimenez sent a copy to the District Attorney.

On December 5, a television news report in San Antonio featured the controversy between Judge Jimenez and Officer Heim. On December 7, a newspaper article appeared concerning Judge Jimenez's accusations against Officer Heim in the letters. Someone had delivered the letters to the media.

After these reports, rumors circulated that attorneys would subpoena Judge Jimenez to testify for the defense in DWI cases in which Officer Heim testified for the prosecution. On March 4, 1992, Judge Jimenez was subpoenaed by defense attorneys in a driving while intoxicated case in County Court at Law Number Nine of Bexar County, cause no. 505296, styled *The State of Texas v. Steve O. Delavega*. Officer Heim testified for the prosecution. Judge Jimenez testified as a character witness that Heim had a bad reputation for truthfulness and veracity and stated his opinion about Officer Heim's DWI enforcement. The State did not move to quash the subpoena and did not contest the judge's right to testify.

Judge Jimenez was interviewed that day on television about his testimony. He stated, "I did not place a high regard for his veracity and truthfulness; therefore, I was biased against the officer." On March 5, Judge Jimenez was interviewed on radio about his testimony and Heim's DWI enforcement.

It is important to note that the Commission has never alleged that Judge Jimenez's accusations against Heim were false in any respect. In fact, evidence showed it was common knowledge that some Bexar County judges and prosecutors believed Heim was committing perjury. Lt. Manuel

Longoria, commander of the Internal Affairs Division of the San Antonio Police Department, was assigned to investigate Judge Jimenez's accusations against Officer Heim. He and his investigator talked to all county court judges in Bexar County about Heim. The judges would only speak in confidence, refusing to go "on the record" against Heim because they "didn't want the problems" Judge Jimenez faced after he accused Heim. Specifically, they did not want to be sanctioned by the Commission. Lt. Longoria interviewed judges, clerks, and prosecutors who had the same concerns Judge Jimenez had about Heim's credibility. Judge Jimenez, however, was the only one who was willing to come forward. The refusal of all the prosecutors and all the other judges to speak "on the record" hindered Lt. Longoria's investigation of Heim, but Judge Jimenez's willingness to talk about Heim with attribution helped Lt. Longoria's investigation. Lt. Longoria wished that the others who suspected Heim of perjury had been willing to say so. The Commission presented evidence that Officer Heim "was recommended (for) fifteen days suspension because, according to the Police Department, ... there were variances and inaccurate and untruthful report writing for an arrest (Heim) made on December 14, 1991." [3]

Lt. Longoria also investigated Judge Jimenez's complaint about Heim's "chickenshit" remark. He considered Heim's remark to be "conduct unbecoming" a police officer.

In addition, Bexar County Assistant District Attorney Robert Lipo was investigating alleged perjury by Heim even before October 3, 1991. Lipo was assigned to the DWI task force. He had heard of "problems" with Heim before he joined the DWI task force. He spoke to prosecutors and defense attorneys about Heim and reviewed approximately 100 of Heim's cases. He had heard that Heim had too many inconsistencies in his report, i.e., that Heim prepared the same report on a suspect's symptoms whether the alcohol level was .10% or .30%. Lipo found that "every" DWI that Heim filed "exhibited the exact same characteristics of intoxication." Also, Lipo found that Heim "rarely, if ever" performed any field sobriety tests on suspects. Lipo was concerned, and he took this information to his superiors. Based on Heim's reputation and Lipo's investigation, Lipo "had questions about Heim's credibility." Lipo testified before us that Heim's reputation for truth and veracity was bad. He was in Judge Jimenez's court by chance on October 3, 1991, when Abel Trevino testified, and he requested a copy of any letter Judge Jimenez might later send in order to further his own investigation of Heim. Lipo testified that among Bexar County prosecutors, Heim's reputation for truth was bad, but prosecutors were unwilling to come forward and say so. Lipo told Judge Jimenez of his concerns about Heim, but he was unsure whether he did so before or after October 10, 1991. Lipo had no personal problem of any kind with Heim and had no social or political relationship with Judge Jimenez and had only been in his court "on a couple of occasions" to assist with large dockets or to fill in for a prosecutor who was absent.

Judge Jimenez testified before the court of review that he "didn't like" Heim's statement about his ruling in the *Ramos* case, he considered it "unprofessional," and he thought he had "an obligation" to report it. He stated:

"Specifically I wanted the police chief to be aware of the comment ... and that I felt that the officer's comment was ... unprofessional, that there has to be a respect for the court and the procedures of the court, and I thought that there was a lack of that professionalism. So I thought it important that I bring it to his attention.

The Police Department's Advisory Action Board reviewed the case ... and found the complaint to be unfounded...." We do not have before us any complaint by Judge Jimenez against Officer Heim on November 7, 1991.

---

**3.** The December 14, 1991 incident was after the date of both letters from Judge Jimenez. In addition, our record contains a letter dated April 14, 1992 from Lt. Longoria to Officer Heim stating "A complaint was made against you by Judge Jimenez III on November 7, 1991."

In his testimony before the Commission, Judge Jimenez stated that he wrote the letter of October 10 because of his concerns about Heim's remark to Trevino, not because of any other concerns, such as perjury or civil rights violation.

Q: What was it that prompted you [to] make such a written response to this particular case? Was it simply the officer's comments that were repeated to you, is that what triggered your making that response?

A: Yes.

Q: If the officer had not said that, you would not have made any written response?

A: Not as to any statement that he made, no.

When asked at the trial before the special court of review what caused him to write the second letter, Judge Jimenez testified:

I didn't receive a response from the police department, and I was wondering in my own mind why they hadn't responded. I started thinking of all the statements made by defense counsel and state's .. attorneys to me in chambers and outside of the office about credibility problems, about veracity problems with this particular officer. I knew that the last hearing that we had that the facts and circumstances in his testimony were so much apart in reality ... that I was obviously biased against the officer, and that in good conscience that I could not have him come into my courtroom and swear under oath to tell the truth, when as the sitting judge ... he lacked credibility with me. And so I wrote that second letter because of my concern.... I had a concern about the public trust in the judiciary. That was my concern.

Judge Jimenez testified without contradiction that he intended the letters to be confidential; he sent them only to the chief of police and the district attorney, and never showed them to anyone else. Evidence showed Judge Jimenez was surprised and displeased when his letters became public, and he attempted to find out who passed them to the media. He denied he had any personal interest in writing either letter and testified he spoke to the media only after the letters became public and were being distorted. Judge Jimenez admitted he was offended by Heim's statement and that he wrote the second letter because he was "so biased against him as a witness that it would be improper for me to have him come into the courtroom." He viewed his attempt to remove Heim's cases from his court as a substitute for recusal.

Judge Jimenez testified that he sought to have Heim's cases transferred because it was necessary to uphold the court's integrity and he had "an obligation as a judge to speak out if ... someone is usurping their authority or is not being honest." He also testified that he has an obligation to remove himself if he has a particular bias against a witness so that he could not judge fairly in a case where the witness testified.

When Judge Jimenez was subpoenaed by the defense to testify in the case of *State v. Delavega* that Heim's character for truth was bad, the State did not move to quash the subpoena or object that it was improper for him to testify.

When asked if he was upset with the internal affairs division and the police department and the District Attorney's office, Judge Jimenez testified:

Yes.... There were district attorneys coming to me quietly and telling me that they believed what I was doing was the right thing to do and they were sorry they couldn't help, but they wanted me to hear their story. I had officers stopping me when I was with my family— three separate events, police officers stopped. I did not know who these people were, and they related to me incidents involving Michael Heim. I had people call me, send me letters during all of this time about their incidents, their particular private incidents with this particular officer, and I was flabbergasted that internal affairs failed to act in the light of these matters and treated those as administrative. I was shocked that the district attorney's office didn't stand firm or didn't let the police department

know that there might be a problem here. I just couldn't believe that they were going to allow that to happen within the criminal justice system. So many people knew about this, yet they were failing to act. And that's what ... was unsettling to me, because I thought I was doing the right thing.

As far as Judge Jimenez knew, only he and Assistant District Attorney Robert Lipo had come forward to question Heim's veracity, although Judge Jimenez was under the impression many judges and prosecutors believed Heim was committing perjury.

When asked if he believed he had prejudiced Officer Heim and had prejudiced the State's cases in other courts in which Heim was a witness, Judge Jimenez stated, "I believe that in good faith I stated what my concerns were to the proper authorities, and that they have the ultimate responsibility."

Judge Jimenez testified that on October 10, 1991, when he wrote the first letter, he already had concerns about Heim's false testimony and racially based arrests, even though he did not make those accusations until October 29.

Q: In your letter of October 29, 1992, your second letter to Chief Gibson—

A: Yes

Q: —you stated there two specific concerns about Officer Heim that weren't mentioned in your first letter.

A: Yes.

Q: The first was that he was testifying falsely, the second was that he was making his arrests based on race.

A: Yes.

Q: Did you also have concern about those matters back on October 10, at the time you wrote your first letter?

A: Yes.

Q: You already had formed an opinion that those things might be going on and you were concerned about them?

A: I was concerned about that because of what I had heard.

Q: Was there any reason you didn't mention those concerns, those two specific concerns in your letter of October 10th?

A: Yes, Judge. I was trying to seek a balance here. I didn't want to get personally involved with it. I knew that those rumors had been going on, and I had heard his past testimony before.

Because of what had happened, I started weighing my feelings and perceptions and his testimony. And I thought that this should now become—it should now be brought to the attention of the chief also.

Q: What exactly should be brought to the attention of the chief?

A: That I had lost faith in the officer's testimony and that—I wanted to also bring to his attention that I felt that the majority of the people that he testified to in my court were Hispanic and that was troubling to me.

Q: Well, those—of course, those concerns were stated in the letter of October 29th. I guess my question is, since you knew those things and had formed those opinions and had those concerns back on October 10th, what caused you to decide not to mention those concerns at that time, but only to mention what you considered unprofessional criticism of yourself by Officer Heim?

A: Because that was the issue that I thought had to be dealt with on its face, that he had made a comment, that someone else had heard the comment, and that I wanted to make sure that the chief knew about it for purposes of the procedures that the—the disciplinary procedures of the San Antonio Police Department were followed.

And, yes, I did have problems with this officer. I mean, it didn't just hit me one day, well okay, I'm going to go ahead and send another letter about his veracity and about the problem that I see as maybe selective prosecution or selective arrests.

So I thought of all of this. This was an ongoing process. It didn't just happen

because of what he said. These things had been going on.

Q: You already had the concern about perjury?

A: I had—I had some concerns about his testimony. And then when he offered that testimony with—which just didn't fit the fact situation, it just caused me to rethink his testimony and his veracity. So at that point, I sent the second letter.

Q: Had you—prior to October 10th, the date of your first letter, had you talked to anyone about your concerns that Officer Heim might be committing perjury or might be arresting people based on their race?

A: I was approached by Assistant District Attorneys about problems with Officer Heim. I didn't approach anybody about it.

Q: Back before October 10th?

A: Yes.

Q: They approached you?

A: Yes.

Q: To talk about these matters?

A: To talk about some of those matters.

Q: The possibility of false testimony?

A: Yes.

Q: The possibility of racially based arrests?

A: Yes. And I referred them to talk to their assistants or the District Attorney himself about it.

Q: Had anyone else—was this one Assistant District Attorney or more than one?

A: It's been more than one.

Judge Jimenez testified that after the letters became public on December 5:

[T]he internal affairs officers and the other officers would tell me that they wished the district attorney's office would do something about this particular officer, and the district attorney's office, including the First Assistant, would come into my office and say, I would hope that the police department finally does something with this officer. It was just ... totally bizarre. And so I would say, why don't—you do something about this, and why are you ... laying the burden on the courts to do something about this? That's why I said (to the media) what I said, because each organization, each agency was pointing the finger at the other.

Judge Jimenez was asked why he thought it was appropriate to write the Chief of Police about statements Heim made to a social acquaintance in a private telephone conversation, and he answered as follows:

Q: It appears that Officer Heim's comment criticizing your decision was made in a private, not publicized, one-on-one telephone conversation with what, apparently, was an old friend, or at least a friendly acquaintance of his, Mr. Trevino.

Do you think possibly you may have overreacted to Heim's criticism in view of the fact that it was expressed in a private phone call to a friendly acquaintance of his?

A: No, Judge. Because the Rules of Professional Conduct and the Code of Conduct, they expressly make note to all of us that the Code applies to not only ourselves, but staff.

He received that contact—he received that phone call, he received that message, and that message was relayed to me, and I felt that he—he's an extension of the court, he heard it, and I should do something about it. So that's why I conveyed it to the administrative offices of the police department.

Judge Jimenez was also asked to explain why in his letter of October 10, he did not express the concerns he already had then about Heim's perjury and selective prosecution and instead only mentioned Heim's insulting remark:

Q: I noticed, as we've talked about before when I asked you some other questions, that there is a difference between the concerns you expressed in your October 10th letter and your October the 29th.

In the 10, all you talked about was criticizing Heim for his criticism of

you, as his criticism being unprofessional. Yet the other allegations were added in the letter of October 29th. Do you see how the first letter might be seen as a personal response by you to injured feelings in view of the fact that the other concerns about perjury and racial discrimination were not announced until 19 days later?

A: I can understand how people would have a hard time getting from the October 10 letter to the October 29 letter. I can understand that. But what a lot of people don't understand is for seven years, for six years, there's been a rotation of criminal district attorneys, there's been pools of defense counsels, there's been police officers, and every time they always drop in the bucket some statement, some inference, some fact, and you start picking this up. You can't help it, because you're in that arena. And so I can understand how it's difficult to get from A to B, but I think you have to look at it from my perspective.

My perspective was it wasn't just a comment. I wasn't lashing out at a comment. I was looking at the entire sequence of the events with this officer, and I just wanted to be up front and personal and direct with the chief about it, and that's what I did.

Judge Jimenez was also asked to explain why he thought it was appropriate to respond as he did to Heim's criticism:

I think that even San Antonio police officers are officers of the court, so to speak. Even though they give testimony for the state, I think that they have an obligation to have a certain demeanor and respect and professionalism. I think that with that goes a certain amount of courtesy. And if I, as a judge, extend courtesies to all of the parties, then I would expect the courtesy to be in kind.

Bexar County Assistant District Attorney Melissa Barlow testified Heim was "a good cop" and that she knew some prosecutors who agreed, but she also knew other prosecutors had the opposite opinion. Barlow had heard prosecutors accuse Heim of photocopying police reports and changing only the names and the vehicles involved when he later arrested someone. Some prosecutors were "pretty upset about that."

The facts related above are undisputed. We emphasize, however, that Officer Heim is not on trial and has had no opportunity to respond to any of the testimony in this proceeding. We in no way mean to imply that any of the allegations about Officer Heim are true. It is not our purpose to decide that question, and we express no opinion on it. The accusations, whether true or false, are relevant in this proceeding only because, if Judge Jimenez reasonably believed them, they tend to show he had a motive for his conduct other than a personal interest in retaliating against Heim.

FINDINGS OF FACT

These facts present two questions. The first is whether Judge Jimenez criticized Heim to advance his own private interest, as alleged, or to serve the public interest, as he testified. The second question is whether the judge's conduct, if it violates the Code of Judicial Conduct, is protected by the First Amendment to the United States Constitution or by Article 1 Section 8 of the Texas Constitution. We will first examine the judge's conduct on and after October 29, 1991, the date of his second letter, and then his letter of October 10, 1991.

A. JUDGE JIMENEZ'S LETTER OF OCTOBER 29, 1991, TESTIMONY OF MARCH 4, 1992, AND MEDIA INTERVIEWS OF MARCH 4–5, 1992.

Regarding the judge's entire course of conduct on and after October 29, 1991, we find, as a matter of fact, that the Commission has not proved by a preponderance of the evidence its allegation that Judge Jimenez acted to advance his private interest. On the contrary, we conclude that all of his activity from October 29, 1991 forward was done to advance the public interest.

Canon 4 of the Code of Judicial Conduct provides:

A judge ... may engage in the following quasi-judicial activities, if in doing so the judge does not cast doubt on his or her capacity to decide impartially any issue that may come before the court:

A. ...

B. A judge ... may consult with an executive or legislative body or official, but only on matters concerning the administration of justice....

TEX.CODE OF JUDICIAL CONDUCT, Canon 4 (1974)

Judge Jimenez did so by writing private letters to the Chief of Police and the Bexar County District Attorney stating that a police officer within their employment and within their jurisdiction appeared to be committing crimes. His letter did not cast doubt on his ability to rule impartially on any issue that may come before the court because, at the same time, he effectively recused himself from Officer Heim's cases. We hold that Canon 4 allows such activity, and that a judge should reveal, not conceal, acts by police officers that, as here, may constitute state and federal crimes.

In finding this fact, we rely on the testimony of Lt. Manuel Longoria and Assistant District Attorneys Robert Lipo and Melissa Barlow. Their testimony shows that a number of Bexar County prosecutors and judges had serious suspicions that Heim was lying under oath in Bexar County courtrooms. Their testimony shows that the public interest Judge Jimenez claimed motivated him in reporting Heim on and after October 29 did, in fact, exist, had been discussed by Judge Jimenez with several prosecutors, and was not unreasonable. We stress, again, that the Commission has never claimed that Judge Jimenez's accusations against Heim were false or baseless.

Because all of Judge Jimenez's communications from October 29 forward dealt only with alleged crimes by Officer Heim and not at all with Heim's private insulting remarks, we find that all of those communications were motivated by public interest. The Commission has failed to prove that Judge Jimenez acted on and after October 29 "to advance the private interest of himself," as alleged.

**B. JUDGE JIMENEZ'S LETTER OF OCTOBER 10, 1991.**

■ The Commission claims the judge's letter of October 10 is a clear example of using the prestige of his office to advance his private interest, specifically, to retaliate against Heim for having criticized the judge in a private telephone conversation. As the Commission states, the October 10 letter says nothing about Heim's alleged crimes and public misconduct; instead, it states only that the judge took "particular offense" to Heim's comment and would not allow it "to go unchallenged."

We find, as a matter of fact, that the Commission has not proved by a preponderance of the evidence that the October 10 letter was written to advance Judge Jimenez's private motive of retaliation against Heim. The letter must be considered along with the entire sequence of events set out above. Those events show that:

1. Judge Jimenez already had concerns about Heim's credibility before his October 10 letter; and

2. Others in the criminal justice system, specifically including Bexar County judges, clerks, and prosecutors, suspected Heim of crimes and prosecutors had approached Judge Jimenez to talk about their suspicions.

Although these concerns are not stated in the letter of October 10, we find there is uncontradicted credible evidence before us that a public interest already existed on October 10. Moreover, Lt. Longoria testified that he considered Officer Heim's statement to Abel Trevino to have been "conduct unbecoming" a police officer. From this, we conclude that Lt. Longoria, the head of the police department's internal affairs division, considered Heim's remark to be a matter of public interest, i.e., one that affected his performance of duty. Lt. Longoria, like Judge Jimenez, obviously believed that Heim's "chickenshit" remark was unprofessional. If Lt. Longoria be-

lieved that, it was not unreasonable for Judge Jimenez to believe that and to report that. In light of this evidence, we find that Judge Jimenez was motivated to write the letter of October 10 because of his concerns about perjury and about conduct unbecoming a police officer, both of which were issues of public interest, and, in addition, because he was personally insulted. If a judge knows a police officer engaged in conduct unbecoming an officer, as defined by the existing rules of the police department, we do not believe that Canon 2 B prohibits him from reporting the conduct just because it insulted him. While Judge Jimenez was undoubtedly insulted, the Commission has not convinced us he wrote the October 10 letter to retaliate, rather than to report unbecoming conduct by an officer who, at the same time, was reasonably suspected of committing crimes. Even if the judge had a personal motive, the Commission has not convinced us by a preponderance of the evidence that the personal motive of retaliation exceeded the public motive of disciplining a police officer reasonably suspected of major crimes and minor bad manners.

## CONCLUSION

This is not just a case where a judge got mad and tried to take a policeman's job because the policeman called him chickenshit. More is involved, as shown by the uncontradicted testimony of uninterested witnesses. Judges are not "thought police." They should not threaten anyone's job because of privately expressed criticism, and if they do, they should expect to be accused of using their office to advance a private interest of retaliation. Judicial service in Texas is not for the meek or the sensitive. It requires a thick skin and an ability to ignore criticism. It can be persuasively argued that Judge Jimenez should have ignored Heim's criticism. Nevertheless, the unique facts of this case convince us that, although Officer Heim's insult may have triggered Judge Jimenez's response, the judge did not respond primarily to promote a private interest of retaliation.

Our decision is based completely on the particular facts proved and on the credibility of the witnesses. Consequently, we need not reach the serious questions of free speech presented by *Scott v. Flowers*, 910 F.2d 201 (5th Cir.1990), and *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992).

MIRABAL, J., joins.

WALKER, C.J., dissenting.

### APPENDIX 1

October 10, 1991

William Gibson, Chief of Police
San Antonio Police Department
P.O. Box 830388
San Antonio, Texas 78283–0388

Dear Chief Gibson:

On October 2, 1991, this Court entertained Defense Counsel's Motion to Suppress Evidence, which centered upon the testimony of Officer Michael Heim. Officer Heim offered his testimony in open court. Testimony was also offered by the Defendant in this matter. After reviewing the testimony of the witnesses and applying the principles of law involved with this Motion, the Court rendered decision favorable to Defendant.

Later that afternoon, Officer Heim telephoned the Court Coordinator, Mr. Abel Trevino, and inquired as to the ruling of the Court, at which time Officer Heim then stated to the Court Coordinator, "That was a chicken-shit decision." This comment was made known to me the next day. I had Mr. Trevino placed under oath in open court and had him testify as to what took place and the comment that was made by Officer Heim. It is enclosed for your review.

I take particular offense to this comment and find that this raises a question as to the professionalism of Officer Heim. This Court has always treated law enforcement with the utmost in courtesy and professionalism and I will not allow this comment to go unchallenged. I would hope that after you review the enclosed transcript your office will take the appropriate personnel

actions as may be required under San Antonio Police Department policy. Please advise me as to your decision in this matter.

Respectfully,
(s) Tony Jimenez, III
Tony Jimenez, III

cc: Steve Hilbig, District Attorney

APPENDIX 2

October 29, 1991

William Gibson, Chief of Police
San Antonio Police Department
P.O. Box 83088
San Antonio, Texas 78282–0388

Dear Chief Gibson:

As of this date, I have not received a response to my letter dated October 10, 1991, with reference to Officer Michael Heim. I want to advise you that I have instructed the District Attorney's Office to transfer any cases involving Officer Heim as the arresting officer from my docket.

Officer Heim has lost credibility with this Court. I found his comment on a prior ruling of this Court to be inappropriate and objectionable. I have found that his testimony in every DWI case contains the same factual circumstances, leading me to believe that he is not being honest in his responses to questions propounded to him. Further, and even more troubling, is the fact that his initial stops appear to be selectively directed against minorities, specifically, Hispanic males, who are arrested under the same or similar circumstances.

This was a very difficult and personal decision to make. However, I believe that in order for me to insure a fair trial to the State this decision had to be made. My request to the District Attorney that these cases be transferred will not adversely affect the criminal justice system. I thought it fair to advise your office of my request.

Sincerely,
(s) Tony Jimenez, III
Tony Jimenez, III

cc: Steve Hilbig, District Attorney

MIRABAL, Justice, concurring.

I join Justice Cohen's opinion. I write this concurrence merely to emphasize two matters.

The dissenting opinion sets out in full a January 10, 1992 letter, which is the complaint filed with the Commission on Judicial Conduct by Officer Michael Heim's wife, Barbara Heim. The letter comprises one-fourth of the dissenting opinion. Because it is such a prominent part of the dissenting opinion, I write to stress that it is an unsworn, out-of-court statement that cannot be considered by us, as triers of fact, as evidence of the truth of any matter stated therein.

Next, I write to punctuate that the message of the majority opinion is not the message the dissent attributes to it. All three members of this special court of review agree that Officer Heim, and any other person, has a right to criticize the rulings of judges. The decisive issue in this case is not whether Officer Heim had a first amendment right to criticize Judge Jimenez's ruling, or whether Judge Jimenez had a first amendment right to respond to such criticism as he did. The controlling issue is whether Judge Jimenez acted primarily to promote a private interest of retaliation. After hearing the sworn testimony and reviewing the other evidence before us, I join in the finding and conclusion that the Commission did not carry its burden of proof.

COHEN, J., joins.

WALKER, Chief Justice, dissenting.

I respectfully and hurriedly file this dissent.

This matter was tried before this Special Court of Review on September 18, 1992. Section 33.034(h), TEX.GOV'T CODE ANN. (Vernon 1988) allows only 60 days for this Court to issue a written decision. The majority opinion was not received in my office until November 6, 1992. That opinion was not actually received by me until November 12, 1992, allowing five days to file this dissent. This should in no way be considered a reflection on Justice Cohen or Justice Mirabal for their diligence has been absolute. I simply raise this issue for leg-

islative consideration of amending § 33.-034(h) to allow at least a 90 day period of time for issuance of an opinion. Enough on that.

Perception is a right belonging solely to the perceiver. Three justices sat in the trial of this cause but this justice walked away with diametrically opposing perceptions of the evidence.

The oral testimony came through four witnesses, Lieutenant Manuel Longoria, Robert F. Lipo, Jr., Judge Tony Jimenez and Melissa Barlow. In a nutshell, most of this testimony was directed toward trying the conduct of Officer Michael Heim, as opposed to the conduct of Judge Jimenez. From the record before us and as evidenced by the majority opinion, Officer Heim has been tried in absentia many times since October 2, 1991 without ever having his day in court.

From the beginning, Judge Jimenez has sought to justify the advancement of his private interest against Officer Heim by contending that he was pursuing a matter of public interest. The evidence does not support this contention. Judge Jimenez, in response to questions as to why he wrote the second letter of October 29, 1992, stated, "... I was obviously biased against the officer, ..." Is this pursuit of a matter of public interest?

In the opinion of this writer, it was at the very moment that Judge Jimenez became aware of personal bias, that further pursuit of the issue became violative of Canon 2 B which states, "A judge should not lend the prestige of his or her office to advance the private interest of himself or herself or others." From the evidence, I conclude that in fact Judge Jimenez was advancing his private interest and not that of the public.

Counsel for the State Commission on Judicial Conduct posed the following question to Judge Jimenez, "If I would ask you to state a couple of words that you would believe would be hallmarks of what is expected of a judge, what would those words be?" Judge Jimenez responded, "integrity, fairness." When personal bias prevails over integrity and fairness, the end result is exactly the case we have before us.

When Judge Jimenez *heard* through his court clerk, Mr. Trevino, the alleged statement of Officer Heim, would not fairness dictate the right of Officer Heim to be heard? Judge Jimenez immediately held an ex parte hearing, placed Trevino under oath, and found Officer Heim guilty without any awareness by Officer Heim that such a proceeding had occurred. Somewhere entwined in the meaning of fairness exists the concept of due process. More is required of judges than self-labeling ourselves as "fair." We must indeed and in fact, be fair and yes, even when our personal feelings are involved, we must demand due process for all.

Based upon Mr. Trevino's sole testimony, Judge Jimenez considered holding a "contempt hearing" directed toward Officer Heim. The record is unclear as to whether Judge Jimenez intended to allow Officer Heim to be present.

Next, in pursuit of his personal bias, Judge Jimenez, unbeknownst to Officer Heim, sent the October 10, 1991 letter to Chief of Police, William Gibson, with copy to Steve Hilbig, District Attorney. The majority has referenced only one paragraph of this letter. Suffice it to say, the October 10 letter focused on Officer Heim's alleged statement to Trevino about Judge Jimenez's ruling at the suppression hearing and how Officer Heim's professionalism should be called into question. Again, Officer Heim is on trial without notice.

The majority states, "It is important to note that the Commission has never alleged that Judge Jimenez's accusations against Officer Heim were false in any respect." I respectfully, but forcefully disagree with this position. The Commission offered and had admitted into evidence the "Charging Document," exhibits and attachments. Among these exhibits under label "D" is a letter, set forth hereafter, which I believe clearly suggests the falsity of Judge Jimenez's accusations against Officer Heim. I should make it clear that I have not considered exhibit "D" for truth therein contained but rather as an absolute denial to

Judge Jimenez's accusation against Officer Heim. Nevertheless, the Commission's only burden was to prove by a preponderance of the evidence that Judge Jimenez had violated Canon 2B. Proof on that issue requires no allegation nor proof as to the falsity of Judge Jimenez's accusations against Officer Heim. The only proof required is evidence of the advancement of Judge Jimenez's private interest.

Judge Jimenez's letter of October 10, 1991 received no response from Chief Gibson. Evidence shows that Judge Jimenez was not satisfied with this lack of response and on October 29, 1991, directed another personal attack upon Officer Heim by means of a second letter to Chief Gibson, copy to Steve Hilbig. Note, Officer Heim was again given no notice.

It is this October 29, 1991 letter which furnishes for me that evidence and proof, even beyond the preponderance requirement, that Judge Jimenez was in pursuit of his own personal and private interest against Officer Heim. On October 29, 1991, Judge Jimenez then accused Officer Heim of dishonesty and racism and in that letter stated, "this was a very different and *personal* decision to make." (emphasis mine.)

It is apparent that having failed to receive the expected response to his October 10, 1991 letter, Judge Jimenez became dissatisfied with the San Antonio Police Department's handling of the matter. In an effort to make his personal position more demanding, Judge Jimenez decided that additional allegations of dishonesty and racism would add more fuel to the flame. I perceive that Judge Jimenez well knew the impact these allegations of dishonesty and racism would have against, in his words, this "anglo" police officer. In response to direct questions from his attorney, Mr. Mark Stevens, Judge Jimenez made the following statement:

"San Antonio is a multi-cultured—cultural city. If you polarize this community, and as a judge who runs county wide, the effect of that is damaging to me, because you would have a hispanic judge complaining of an anglo police officer in a multi-cultural city."

Historically Judge Jimenez began his law practice in Texas in 1976. His first judicial experience was as municipal judge for the City of Elmendoff, Texas, south of San Antonio. Judge Jimenez took over the County Court at Law bench of Bexar County in 1985. Thus, Judge Jimenez, an elected official, well knew the effect that charges of dishonesty and racism would have in Bexar County. The best that I can determine from the evidence, these unsubstantiated charges against Officer Heim did exactly what Judge Jimenez foresaw or should have foreseen that they would do, i.e., create a polarization in this multi-cultural community.

Judge Jimenez took no precaution for making either of his two letters confidential. The evidence is lacking as to how or by whom these letters ended up in the possession of the news media. The resulting effect of these letters reaching the media was newsworthy to say the least. Headlines became "Judge Labels Arresting Cop a Liar," "Judge Picking on Officer, Wife Says," "Judge Testifies in DWI Proceeding." This news was also covered by television and radio stations.

The majority states, "Evidence showed that Judge Jimenez was surprised and displeased when his letters became public and he attempted to find out who passed them to the media."

Judge Jimenez need look no further than himself. Judge Jimenez made no effort whatsoever to prevent these letters from reaching the hands of anyone. These letters were simply open letters with no restriction as to use, originals to Chief Gibson, copies to Mr. Steve Hilbig. Judge Jimenez testified that he intended the letters to be confidential which I view as merely an after the fact effort of explaining away his lack of concern for confidentiality.

Judge Jimenez continued his personal pursuit toward Officer Heim by then accepting invitations from the television and radio media to appear publicly. I can only view this as evidence of Judge Jimenez's

unwillingness to allow proper authority to handle matters relating to Officer Heim. This is additional proof of Judge Jimenez's continued and unyielding pursuit of his private animosity against Officer Heim. Further, evidence shows that Judge Jimenez began his own private investigation of Officer Heim.

By this time, Officer Heim had been tried many times in absentia. The first trial was held in Judge Jimenez's courtroom on the sole testimony of Mr. Trevino. The second and third trials were the October 10th and 29th letters. The fourth trial of Officer Heim was in the media and the fifth trial of Officer Heim occurred before this Court. Yet, Officer Heim has still not had his day.

Even though Officer Heim has heretofore gone hence without day, we do have before us, exhibit "D", a letter dated January 10, 1992, directed to the Commission on Judicial Conduct, constituting a complaint against Judge Jimenez, filed by Barbara Woodward Heim, wife and attorney for Officer Heim. This letter initiated the investigation of the conduct of Judge Jimenez. Lengthy though it be, I set it forth only to show that possibly there exists another side to the heretofore one sided story advanced by Judge Jimenez. The letter is as follows:

To Whom It May Concern:

Bexar County Court at Law No. 7 Judge Tony Jimenez is attempting to use his position to ruin the reputation of a San Antonio police officer, Officer Michael Heim. Officer Heim was a Bexar County Sheriff's Deputy for five years and has been a San Antonio police officer for over twelve years. Often, a law enforcement officer's only asset is his good name and reputation for fairness.

Judge Jimenez' efforts began in October, 1991 with two letters sent to San Antonio Police Department Chief William Gibson questioning Officer Heim's professionalism, integrity and objectivity in the enforcement of the law. Enclosed herewith are copies of these letters.

This series of events was initiated by a ruling by Judge Jimenez on a Motion to Suppress hearing questioning the proba-ble cause for the stop, in which Officer Heim was the arresting officer/witness. Officer Heim is assigned to the San Antonio Police Department's D.W.I. Enforcement Unit. The Defendant in this case was arrested for D.W.I. and D.W.L.S. after being stopped for driving at 10 MPH in a 30 MPH residential area at 3:30 A.M. (a suspicious person/vehicle which was impeding traffic—case law: 1976 *Greer v. State* majority of probable cause—driving too slowly). The front right passenger also was not wearing a seat belt. The vehicle was stopped by Officer Heim. He found the driver to be intoxicated, arrested him for D.W.I. (0.18 BAC) and driving while license suspended. On October 2, 1991, following the Motion to Suppress hearing, the case was dismissed by Judge Jimenez. This particular Defendant was on probation for D.W.I. in Judge Jimenez' Court at the time of the hearing and has subsequently been arrested again for D.W.I.

When Officer Heim learned of the Judge's decision by telephone from the Judge's court co-ordinator, Abel Trevino, Officer Heim expressed shock, great surprise and disappointment. It was later reported by Abel Trevino to Judge Jimenez that Officer Heim had described his decision as "chicken shit." These were not any words used by officer Heim. Officer Heim did not use any profanity in his telephone conversation with Abel Trevino.

Officer Heim has appeared many times in Judge Jimenez' Court over the past six to eight years. Never before, to Officer Heim's knowledge, has any question concerning Officer Heim's job performance or demeanor been raised by Judge Jimenez or any other Judge in Bexar County. Since October 2, 1991, Officer Heim has not appeared in County Court No. 7, having received no subpoenas requiring his presence as a witness, nor does he wish to be part of any proceeding in a court where the Judge does not follow the law based on his personal prejudices, whims or biases.

Officer Heim is known as an uncompromising enforcer of the law, especially

the D.W.I. statutes since he has been a member of the San Antonio Police Department D.W.I. Task Force as of March, 1986. He will arrest and has arrested any motorist found to be driving while intoxicated, regardless of who they are, who they know, their occupation or their ethnic origin. Officer Heim's main concern is public safety through strict enforcement of existing laws.

Judge Jimenez due to his personal biases is refusing to handle the business of his Court in a fair and impartial manner. He did not bother to find out that Officer Heim was assigned to a heavily Hispanic part of San Antonio before deciding not to hear his cases and claiming his stops were racially biased. If Judge Jimenez was unable to be a fair and impartial judge in this case in regard to Officer Heim's testimony, why did he continue to hear the case?

The letters from Judge Jimenez to Chief Gibson containing the unsubstantiated allegations adversely reflecting upon Officer Heim's character were released by Judge Jimenez to a reporter from a San Antonio newspaper. Judge Jimenez is exerting pressure on those in power (Bexar County District Attorney and San Antonio Police Department Chief of Police) to have Officer Heim neutralized as a credible witness in D.W.I. cases (Officer Heim has filed over 3,000 cases in the last eight to ten years). After six years of testimony in Judge Jimenez' Court by Officer Heim, Judge Jimenez now presents these allegations.

Michael Heim's effectiveness as an impartial officer of the law has been seriously attacked by a group of politicians, including defense attorneys, in an attempt to silence him and prevent him from arresting anyone and everyone found to be D.W.I. in the course of his duties.

By characterizing Officer Heim's official activities as racially motivated, Judge Jimenez pushes every political panic button on the local scene. Any fair examination of the facts would reveal that the area of his assignment (the Southwest quadrant of San Antonio) for the past ten years is heavily populated, predominantly Hispanic (not a minority in this city), with a very large concentration of bars and alcohol retailers as well as a very high number of alcohol-related accidents, injuries, fatalities and property damage statistics. A recent study found that the typical person arrested for D.W.I. in Bexar County was an Hispanic single male, 30 years old.

Anyone familiar with the elements of the offense of D.W.I. knows that the person arrested must be driving or operating a motor vehicle. Probable cause for a stop must be present (usually a traffic violation) and the operator must show combined signs and symptoms of intoxication. The operator would be arrested and offered a breath test by a certified intoxilyzer operator. Unless these conditions exist (and the language describing these events tends to be the same or similar), there can be no effective case filed for D.W.I.

Subsequent to these letters, Judge Jimenez asked Officer Heim's Sergeant if officers in his unit were assigned to work any particular area of town. Judge Jimenez asked his Sergeant why more "northsiders" (San Antonio's north side has more Anglo concentration) were not seen in his Court. Officer Heim is not responsible for the number of "northsiders" appearing or not appearing in Court. The Judge appears to have a problem with racial background of the persons appearing in Court. Officer Heim's racial background is Anglo so I additionally question whether the Judge has a problem dealing with an Anglo officer arresting non-Anglo's.

I respectfully request that your Commission investigate Judge Jimenez' conduct in these matters, and inform me of your findings.

Yours truly,<br>
/s/Barbara Woodward Heim<br>
Barbara Woodward Heim

BWH/gr

cc: San Antonio Police Department Chief
    William Gibson
    Bexar County District Attorney
    Steve Hilbig

If it be true that Officer Heim performed his duties in a predominately Hispanic area of San Antonio, we could perhaps take judicial notice of the fact that most D.W.I. contacts and arrests would be as to Hispanic males. Judge Jimenez, in his letter of October 29, states as a fact, "Further, and even more troubling, *is the fact* that his initial stops appear to be selectively directed against minorities, specifically Hispanic males, who are arrested under the same or similar circumstances." (emphasis mine.) How, under such circumstances, would Judge Jimenez suggest that Officer Heim do his job? Must Officer Heim cease in arresting Hispanic males?

There is no evidence in the record of civil rights complaints against Officer Heim for the performance of his duties. I can only glean from the evidence before us that Judge Jimenez unilaterally determined without supportive basis, that Officer Heim was guilty of racism and that it was incumbent upon Judge Jimenez to represent all the people in righting this alleged wrong.

Judge Jimenez testified of his personal bias against Officer Heim. This personal bias was further made evident through statements of counsel for Judge Jimenez. "He thought it over, and he came to the conclusion—the conclusion that he was now biased, irreparably biased against Michael Heim, and that he could no longer be fair to the State of Texas and Mr. Heim in his court."

It is when Judge Jimenez's personal bias evidenced itself that Judge Jimenez should have backed off and allowed proper authority to take control of the matter. Judge Jimenez did not back off, but continued, more as an attorney representing a cause, than as a judge concerned in avoiding impropriety and the appearance of impropriety in all his actions, as is the prefaced command under Canon 2 of the Code of Judicial Conduct.

Counsel for Judge Jimenez defends his client's actions as, "He had a public duty to come forward and speak the truth, and that is exactly what the First Amendment and the Texas Constitution protect, and not only protect, but require of him to do as a judge and require in the public's interest."

I can but wonder as to the concern Judge Jimenez gave to Officer Heim's rights under the First Amendment and the Texas Constitution to criticize Judge Jimenez's decision, if in fact he did, to suppress the evidence in the case of *The State of Texas v. John A. Ramos.* When we as judges become so personally involved in matters before us that we elevate our protected rights and freedoms above all others, the system begins to derail. Do judges have greater rights under the First Amendment than other people? Even though Mrs. Heim, in her complaint of January 10, 1992, denies on behalf of Officer Heim, the statement alleged by Mr. Trevino to have been made, wouldn't such comment be protected under the First Amendment to our United States Constitution? Shouldn't we as judges, diligently seek to protect all individual freedoms of expression even when such views call into question our own decisions? Certainly, if the First Amendment protects the burning of our American Flag, it must be broad enough to protect an individual's questioning of a judge's decision. When we as judges engage in that personal pursuit of challenging every confirmed or unconfirmed disagreement with our rulings, then no time shall be left for the performance of our intended function.

I would find as a fact from the evidence before us that Judge Jimenez sought to advance his private interest through personal pursuit of that interest in an effort to bring Officer Heim to public disdain and humiliation. I would further find that had Officer Heim openly admitted making the statement testified to by Mr. Trevino, that Judge Jimenez had no cause, no right, no reason and no justification for bringing about community upheaval, simply because his ruling was challenged. It is clear to this writer that Judge Jimenez undertook to personally handle those jobs belonging to other authorities. This is precisely what Canon 2 B seeks to avoid.

The State Commission on Judicial Conduct found that Judge Jimenez had violated Canon 2 B and issued a private admonition.

Under the facts of this case, the Commission was more than lenient. Since my opinion is minority, I find no need to express the sanction which I would impose against Judge Jimenez.

My closing concern is for the message sent forth by the majority's opinion. The message is that if we as judges do not like what someone thinks or allegedly thinks of our decisions and opinions, we may then engage in our own personal vendetta against that person to any limit we so desire. Furthermore, we need not concern ourselves with due process in so doing.

We can only speculate as to the effect of Judge Jimenez's loosely used words like racism and dishonesty may have, not only upon Officer Heim as he drives the streets of San Antonio but also upon other law enforcement officers. When a judge makes public accusations of racism, such accusation carries the weight of Judicial Declaration, and to many it carries the weight of Law. It is not Judge Jimenez who must now go forth onto the highways, the by-ways, the streets and dark alleys of San Antonio, wearing the label "dishonest—racist." No, Judge Jimenez may sit comfortably and safely behind bench or in chambers evaluating the conduct of law enforcement officers in the performance of their duties.

In today's society the mere word racism carries a highly volatile stigma. Too many times its use is for public affect rather than depiction of truth. We as Judges, above all others must use extreme care and caution before using labels of such destructive potential.

Last but not least, judges must not advance their private interest in causes for we see before us the result.

It is saddening to think that all this might have been avoided by a telephone call from Judge Jimenez to Officer Heim asking him to drop by and discuss the ruling. Is there room for humility in the Judiciary?