**In re Honorable Rick DAVIS, Judge, 272nd District Court, Brazos County, Texas.**

Special Court of Review.

July 2, 2002.

Bob Warneke, Jr., Seana Willing, Austin, for State Commission on Judicial Conduct.

Lane D. Thibodeaux, Law Office of Lane D. Thibodeaux, Bryan, represents Judge Davis.

Before Chief Justice BOYD, Justices B.A. SMITH and WALKER.

BEA ANN SMITH, Justice.

In April 2001, the Honorable Richard "Rick" Davis, a new district judge in Brazos County, determined that a female prosecutor in his courtroom, Laura Cass, was attempting to undermine his authority. Just before his election to the bench, Judge Davis served for several months as a criminal defense attorney and had several run-ins with the same young prosecutor who was just out of law school. This history may account for the bizarre series of events that led Judge Davis to publicly humiliate Ms. Cass in most caustic terms and to write injudicious letters to the district attorney and the media concerning Ms. Cass's "gross misconduct," all in an attempt to have the prosecutor removed from his courtroom.

In May 2001, Bill Turner, Brazos County District Attorney, reluctantly filed a complaint with the State Commission on Judicial Conduct,[1] saying that Judge Davis's escalating attacks on the district attorney's office caused him to question the judge's ability to be fair to the State. Mr. Turner further alleged that the judge's vicious personal attacks against Ms. Cass, and the judge's campaign to involve the media in his vendetta, had undermined public confidence in the judiciary. The Commission investigated the complaint, received a written response from Judge Davis, and invited him to appear informally to testify.

The Commission found that in his dealings with Ms. Cass, Judge Davis had not been dignified, patient or courteous, in violation of Canon 3B(4) of the Code of Judicial Conduct. See Tex.Code Jud. Conduct, Canon 3B(4), reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G app. B (Vernon Supp. 2002). Indeed, the Commission expressed dismay at the inappropriate language Judge Davis used, calling Ms. Cass "sneaky and surreptitious," "treacherous," and ascribing to her the "compassion of an Auschwitz prison guard." It further found that by involving the media in this conflict, Judge Davis cast public discredit on the judiciary and created reasonable doubt about his capacity to fairly judge criminal cases brought by the district attorney's office, in violation of article five of the Constitution and Canon 4A(1). See Tex. Const. art. V, § 1–a; Tex.Code Jud. Conduct, Canon 4A(1). On March 1, 2002, the Commission issued Judge Davis a public reprimand.

Judge Davis appealed the Commission's sanction and this special court of review was appointed to conduct a trial de novo.[2] See Tex. Gov't Code Ann. § 33.034 (Vernon Supp.2002). After the Commission issued its formal charging instrument, this special court convened a hearing on June 10 and 11, 2002, at which the Commission had the burden to prove by a preponderance of the evidence that respondent willfully committed one of the charged violations. See id. § 33.001(b); see also In re Bell, 894 S.W.2d 119, 131 (Tex.Spec.Ct.Rev.1995). This special court may dismiss the charges, affirm the Commission's decision, impose a lesser or greater sanction, or recommend that formal proceedings be instituted by the Commission for censure or removal. Tex. Gov't Code Ann. § 33.034(i)

---

1. The Commission is charged with enforcing the constitutional provisions authorizing the discipline and removal of judges and with sanctioning violations of the Code of Judicial Conduct. See Tex. Const. art. 5, § 1–a; Tex Gov't Code Ann. § 33.002 (Vernon Supp. 2002).

2. The special court of review consists of Chief Justice John T. Boyd, Seventh Court of Appeals, Amarillo, designated Presiding Justice; Justice B.A. Smith, Third Court of Appeals, Austin; and Justice Sue Walker, Second Court of Appeals, Fort Worth.

(Vernon Supp.2002); TEX.R. REM'L/RET. JUDG. 9(d) (West 2002). The decision of the special court is not subject to review. TEX. GOV'T CODE ANN. § 33.034(i); TEX.R. REM'L/RET. JUDG. 9(c) (West 2002).

## DEFENSE

At the de novo hearing, Judge Davis did not deny committing any of the actions leading to his reprimand. Rather he sought to justify his public rebuke of Ms. Cass by detailing her disrespectful actions in the case of Joe Friday Rodriguez, Jr. against a background of previous behavior that led Judge Davis to discredit her integrity. Additionally, Judge Davis asserts that his First Amendment right to bring attention to this matter of legitimate public concern bars any disciplinary action for his contacting the media about Ms. Cass's misconduct. *See* U.S. Const. amend. I. Moreover, he insists that he is being sanctioned, in whole or in part, because of his religious beliefs, yet another reason why the First Amendment prevents any disciplinary action against him. Finally, Judge Davis presented testimony from lawyers in the community regarding his reputation for fairness and courtesy, and extolling his efficiency and effectiveness in the courtroom, in an attempt to refute the Commission's charges that the judge's admitted actions involving Ms. Cass and Mr. Turner had cast discredit on the judiciary and created doubts about Judge Davis's impartiality.

## I. Justification for Rebuking Ms. Cass

To evaluate Judge Davis's belief that he was justified in rebuking Ms. Cass for her perceived misconduct, we will first give some detailed background regarding the *Rodriguez* matter, and then review the actions that the judge took to chastise that prosecutor and the district attorney's office. We will also describe a few earlier incidents that Judge Davis claims diminished his opinion of Ms. Cass's integrity.

### Joe Friday Rodriguez

On April 18, 2002, Judge Davis conducted a probation revocation hearing in a case styled *State v. Joe Friday Rodriguez, Jr.* Ms. Cass represented the State and proved up Rodriguez's probation violations, but Judge Davis declined to revoke probation, deciding to leave Rodriguez free to file an income-tax return that might produce a refund to be credited against the probationer's child support obligations. The case was recessed for sixty days. There was an outstanding arrest warrant for Rodriguez in another matter involving delinquent child support. At her supervisor's direction, Ms. Cass telephoned Robert Orozco, the assistant attorney general in charge of that matter, to inform him that Rodriguez's probation had not been revoked and that the outstanding warrant had never been entered in the TCIC, Texas Criminal Information Computer, a statewide reporting system. She mentioned that if the warrant were entered in the TCIC, Rodriguez would be arrested when he next reported to his probation officer. When Judge Davis learned of this phone call, he jumped to the conclusion that Ms. Cass was trying to undermine his decision to continue Rodriguez's probation. He was enraged and immediately contacted the judge who had issued the outstanding warrant to have it dismissed. There was, then, no danger that his order continuing Rodriguez's probation would be countermanded.

Nevertheless, Judge Davis summoned Ms. Cass to his courtroom for a "status hearing" in the *Rodriguez* matter. He questioned Ms. Cass as to whether she had called Orozco about the outstanding warrant. Ms. Cass admitted making the call at the suggestion of her supervisor, Mr. Clark. Orozco testified and characterized

Cass's actions as "pushing" the warrant. Ms. Cass denied pushing the warrant, but said she followed office procedure in notifying another office about an outstanding warrant. Mr. Clark informed the court that he had instructed Ms. Cass to make the call and that this was standard procedure in the district attorney's office. Despite Mr. Clark's explanation and Ms. Cass's denial that she had done anything more than inform Orozco about the outstanding warrant, Judge Davis issued the following reprimand in open court, with various members of the public present:

> Ms. Cass, I conclude that you have engaged in conduct that is sneaky, surrepitious, [sic] and was deliberately calculated to undermine this Court's intention with respect to this defendant, Joe Friday Rodriguez, Jr.

> You are not welcome in the Court. You are excused. The Court takes judicial notice of the fact Mr. Clark is present. Mr. Clark, I do not know who will take over prosecution of this case but I want whoever it is who takes it over to be fully aware I tend to fully enforce the bond conditions that I imposed on Mr. Rodriguez.

The date of the hearing was April 24, 2001; events quickly escalated. Mr. Turner had earlier offered to remove Ms. Cass from Judge Davis's courtroom because of hostility stemming from their previous encounters before the judge assumed the bench; Judge Davis declined, saying he could be fair and impartial in dealing with Ms. Cass. But this day, the district attorney was out of town. Turner's first assistant, Margaret Lalk, immediately called to inform the judge that Ms. Cass would be returning to his courtroom; she also asked for a transcript of the hearing at which the judge had told Ms. Cass she was not welcome in his court.

Although the judge had virtually banned Ms. Cass from his courtroom at the earlier hearing, he apparently realized upon reflection that he had no such authority and must appeal to the district attorney to remove her. This prompted Judge Davis to write a letter later that afternoon to Bill Turner, whom he knew was out of town, expressing his displeasure with Ms. Cass's "gross misconduct" in the *Rodriguez* matter, conduct which the judge again characterized as "sneaky, surreptitious and [a] calculated effort to undermine the Court's intended course of action." The letter concluded, "I think that it would be best for all involved if you were to assign a different prosecutor to this Court in Ms. Cass' stead." In light of the judge's public attacks on Ms. Cass, Turner refused to remove her from Judge Davis's court, so as not to give the impression that he agreed with the judge's accusations. By supporting his assistant, the district attorney also incurred the ire of the judge.

That same afternoon, Judge Davis forwarded a copy of his letter to Turner, along with the two transcripts from the still pending *Rodriguez* case, to various media. The sensational story of the fight between the judge and the district attorney ran on the evening news. Ms. Cass testified that when a reporter called her for a comment about Judge Davis's allegation that she was guilty of "gross misconduct," she thought someone was playing a practical joke until she saw the story on television; her husband heard it repeatedly on the radio.

Four days later an article about the conflict was published in the *Bryan–College Station Eagle*, the local newspaper. Judge Davis informed the reporter that "it is inappropriate for a lawyer who has been licensed less than six months to take it upon herself to thwart my considered decision." Colleen Kavanagh, *Turner rejects*

*judge's request, Davis asks for reassignment of assistant DA from his court,* BRYAN–COLL. STATION EAGLE, April 28, 2001, at A1. In addition to printing the accusation that Ms. Cass was guilty of "gross misconduct," the article added the judge's comment, "not only did the prosecutor thumb her nose at me, she stuck her tongue out at me." *Id.* at A1–2. Ms. Cass testified that she was very upset about Judge Davis's allegations, personally and professionally, but thought it was not her place to comment to the media. She said that only when the Commission issued its public reprimand was her reputation in the community rehabilitated.

The newspaper article on April 28 cast Judge Davis in an unfavorable light. It included comments from a law professor that although the prosecutor's actions might have made the judge unhappy, she was only doing her job. Professor Neil McCabe of South Texas College of Law continued, "I've got a real problem with the judge trying to use the media to put pressure on the DA to get what he wants. The judge's behavior raises questions about his conduct, not so much the prosecutor's conduct." *Id.* at A2. This unfavorable publicity prompted a letter-writing campaign by the judge. He wrote a two-page, single-spaced letter to the newspaper reporter: "Through your reporting, the DA's office was enabled to convey a false impression to the public that 'this poor little prosecutor' was doing her job."

Next, Judge Davis wrote a five-page, single-spaced letter to Bill Turner. Although the letter is undated, the testimony indicated that the letter was written on May 2, 2001. This letter asserts the judge's presumed biblical authority for his decision-making and characterizes the district attorney's criticism of him as mockery:

Do you not know that I anguish in prayer before God over many of my decisions? By mocking them, you invade God and my relationship, and *it is as if you have defecated on Mt. Sinai, holy ground. . . .* In Deuteronomy, it is written: The man who shows contempt for the judge or for the priest who stands ministering there to the LORD your God must be put to death. You must purge the evil from Israel. All the people will hear and be afraid, and will not be contemptuous again. Therefore, you brother, commit a capital sin in God's economy whenever you are contemptuous. When you say such things, it is just as bad in God's sight *as if you were to duck into one of your assistant's offices and fornicate with one of your assistants.* Furthermore, these sins have accumulated over time.

(Emphasis added.) (Biblical citations omitted.) Judge Davis goes on to describe Ms. Cass:

Because of you and your assistant, my work is not only a burden. It is drudgery. I look out over the courtroom and see a prosecutor whom I do not trust, whom I believe is treacherous, *whom I believe probably has the compassion of an Auschwitz camp guard,* and whom I believe would do anything to get her way.

(Emphasis added.)

Less than a week later, Judge Davis wrote a three-page, single-spaced letter to Neil McCabe, the law professor who had criticized his actions in the newspaper article.

I am confident that I scrupulously followed the Canon's [sic] of Judicial Conduct in this matter. . . . Do you know what I want? I want to be able to know that I can control a probationer to see if I can reform his conduct, and I want to be able to do so without having to think

simultaneously what will be necessary to preclude a sneaky prosecutor from surreptitiously undoing what I am of a mind to do. Am I abusing my authority by harboring that desire? Am I abusing my office? Am I exceeding my authority?

On May 14, 2001, after all of this, Turner filed his complaint with the Commission.

*Earlier Clashes with Ms. Cass*

We heard testimony that in the six month period before he assumed the bench, Judge Davis frequently tangled with Laura Cass, who was working in the district attorney's office under supervision because she had not yet been licensed. In one matter, she declined to offer Mr. Davis's client deferred adjudication. He threatened to go over her head to Mr. Turner. Mr. Turner testified that he had asked all of his assistants to warn him if defense counsel planned to approach the DA directly so he could review the file and be prepared. When Ms. Cass followed this procedure, Davis accused her of going behind his back and being "sneaky." In another matter, he complained that Ms. Cass failed to turn over a witness statement to him.

But his biggest grievance against Ms. Cass involved the revocation of shock probation for Judge Davis's former client, Jeffrey Prado. As his defense counsel, Davis negotiated a plea agreement for Prado to enroll in boot camp. Prado was rejected from boot camp. Mr. Clark, who was handling the matter for the State, testified that he assumed a medical problem had been the cause of Prado's rejection but later learned that he had been rejected because of a "major disciplinary violation." Mr. Clark insisted that he never knew of any disciplinary problem or he would not have agreed to the alternative plea of shock probation that permitted Prado to serve the time he would have spent in boot

camp and then be placed on shock probation. By the time of the shock probation hearing, Judge Davis had taken the bench and Prado had new counsel. Also by then, the district attorney had learned the actual reason why Prado had been rejected from boot camp. Mr. Clark explained that Prado's disciplinary infraction was a violation of his plea agreement. The hearing was held before another district judge. Mr. Clark was late for the hearing and asked Ms. Cass to stand in for him until he could get there. The trial court reviewed the file and expressed "serious concern" about placing Prado on probation. He asked Ms. Cass what she had to say about the matter. She informed the court that the State had strong reservations about Prado successfully completing probation, but conceded that "[t]he agreement was that he be considered for shock." The judge found her comment less than helpful and asked the defense attorney for his response. Ms Cass asked Mr. Clark, who had now arrived at the hearing, what she should say. He told her she must give the judge her opinion. The judge again asked if she had anything further "after her huddle." Ms. Cass responded, "Your Honor, the State does not feel that he should be placed on probation." Prado was sentenced to confinement.

Judge Davis was irate when he learned that Prado had not been placed on probation as agreed. He complained to the DA that Ms. Cass had violated another prosecutor's plea agreement. Initially, Mr. Turner agreed that Ms. Cass had "done wrong" by not sticking to the plea agreement, but when he learned of Prado's disciplinary violation and that the judge had pressed her for her opinion, Mr. Turner condoned Cass's actions. Judge Davis never learned that Turner revised his judgment of Cass's behavior. And for his part, Judge Davis never forgave Ms. Cass

for her handling of his former client Prado; it was apparent from the testimony before the special court that this resentment highly colored the judge's suspicions and his over-reaction to Ms. Cass's perceived "disrespectfulness" in the *Rodriguez* case.

*No Justification*

█ We find by a preponderance of the evidence that Ms. Cass did not act unethically in the *Rodriguez* matter by informing the attorney general that Rodriguez's probation would not be revoked or that its unserved warrant had not been entered in the TCIC. Even if the prosecutor had "pushed" the warrant, as the judge believed, we find that such behavior, while it might irritate a judge, would never justify the extreme retaliatory actions taken by Judge Davis. We note that none of the actions taken by the judge was necessary to enforce his decision to keep Joe Friday Rodriguez, Jr. on probation, as the judge himself had already taken steps to have the outstanding warrant recalled. Based on a preponderance of the evidence, we conclude that it was not a threat to Judge Davis's authority but an affront to his pride that prompted his humiliation of Ms. Cass, his fight with the district attorney, and the unfavorable publicity about this dispute.

We are concerned that any judge would choose to use such disturbing tactics and inappropriate language to respond to those who might question his decisions. We are even more concerned that Judge Davis still refuses to acknowledge that his actions rebuking Ms. Cass and Mr. Turner violated the Code of Judicial Conduct. Canon 3B(4) states that a judge "shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." TEX.CODE JUD. CONDUCT, Canon 3B(4). However courteous Judge

Davis is to the many jurors who serve in his courtroom, as reflected in the juror evaluations we reviewed, his treatment of Laura Cass and Bill Turner was anything but patient, dignified and courteous. We resoundingly reject his "justification" for his actions and find that the Commission established by overwhelming evidence that Judge Davis willfully violated his duty to treat both Ms. Cass and Mr. Turner with patience, dignity and courtesy.

Indeed, after reviewing all of the evidence presented, we are convinced that Judge Davis embarked on a personal vendetta to destroy the reputation of a young prosecutor who we find was not guilty of any misconduct. This is a perversion of the trial judge's time-honored role to mentor young attorneys who practice before his court. By the words he used to rebuke Ms. Cass, Judge Davis undermined her reputation for ethical behavior in the very community where her job depended upon her reputation for truthfulness. Ms. Cass and Mr. Clark both testified about their concerns as to how Ms. Cass would be perceived by jurors in an important criminal trial in Judge Davis's court the week following the news stories about her "gross misconduct." Judge Davis's words and his actions reveal his inability to handle appropriately the criticism that inevitably comes to every judge. "Judicial service in Texas is not for the meek or the sensitive. It requires a thick skin and an ability to ignore criticism." *In re Jimenez,* 841 S.W.2d 572, 581 (Tex.Spec.Ct.Rev.1992). Had Mr. Turner not risked incurring the wrath of this judge by standing up for his assistant district attorney, Judge Davis might have destroyed the career of a young attorney who demonstrated to this special court remarkable restraint and a proper respect for the legal system, despite this unfortunate ordeal.

Canon 2A provides that a judge "shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." TEX.CODE JUD. CONDUCT, Canon 2A. Canon 4A(1) provides that a judge's extra-judicial activities shall not "cast reasonable doubt on the judge's capacity to act impartially as a judge." *Id.,* Canon 4A(1). The tenor and substance of Judge Davis's ill-advised letters following the events in his courtroom on April 24, 2001, did not promote public confidence in this judge's integrity. Likewise, Judge Davis's public attacks on the district attorney's office in general and one prosecutor in particular (while she was still appearing before his court), created doubt that he could be fair in dealing with the State, despite his proclamations (then and now) that this dispute would never influence his judgment. Judge Davis continues to overlook the harm created by even the appearance of bias or prejudice. The Commission met its burden of proving that the judge's public actions cast reasonable doubt on his ability to act impartially and did not promote public confidence in the integrity and impartiality of the judiciary.

The Constitution provides that a judge may be removed from office for willful or persistent conduct that casts public discredit upon the judiciary or administration of justice. TEX. CONST. art V, § 1–a. As the unfavorable newspaper article illustrated, Judge Davis did cast public discredit on the judiciary and create a lack of confidence in the administration of justice, in Brazos County and beyond, by publicly airing his retaliatory rhetoric and by using the press to try to pressure the DA to remove a prosecutor that he himself did not have the authority to ban from his courtroom. The very background that the judge relies on to justify his condemnation of Ms. Cass serves instead to establish that he used the power of his office to retaliate against someone with whom he had a personal grudge, stemming in part from his perception that Ms. Cass did not abide by an agreement for shock probation that he had negotiated for his former client, and in part from perceived aggravations he attributed to her behavior in other litigation.

 Judge Davis asserts that the facts fail to establish that he acted with the requisite intent to satisfy the "willful violation" standard. Willful conduct requires a showing of intentional or grossly indifferent misuse of judicial office, involving more than an error of judgment or lack of diligence. *Bell,* 894 S.W.2d at 126. Contrary to Judge Davis's assertion, however, a judge need not have formed the specific intent to violate the Code; as long as he intended to engage in the conduct for which he is disciplined, he is guilty of a willful violation of the Code. *See In re Barr,* 13 S.W.3d 525, 539 (Tex. Rev. Trib.1998, appeal filed). Judge Davis argues that his undated letter to Mr. Turner was no more than a lapse in judgment. We disagree. The judge demonstrated an intentional or grossly indifferent misuse of his judicial office in seeking to pressure the DA to remove Ms. Cass from his courtroom. Judge Davis knew or should have known that this exceeded his judicial authority.

Unless Judge Davis prevails on his First Amendment defense, the Commission has presented overwhelming evidence that this judge violated the Code of Judicial Conduct in the particulars we have described, and that he engaged in willful or persistent conduct clearly inconsistent with proper performance of duties, or conduct that cast public discredit on the judiciary and the administration of justice sufficient to authorize disciplinary action. *See* TEX. CONST.

art. V, § 1–a; TEX. GOV'T CODE ANN. § 33.001(b) (Vernon Supp.2002).

**First Amendment Defense**

■ Judge Davis argues that the First Amendment protected his right to comment to the media about Cass's misconduct and his desire to have her removed from his courtroom. He relies primarily on the Fifth Circuit opinion in *Scott v. Flowers*, 910 F.2d 201 (5th Cir.1990). Scott was a justice of the peace in Fort Bend County who learned that most defendants who appealed traffic offenses from justice court to the county court at law ultimately succeeded in having the charges dismissed or the fines sharply reduced. *Id.* at 203–204. Judge Scott wrote an "open letter" to county officials attacking the district attorney's office and the county court at law for dismissing so many traffic appeals. *Id.* at 204. The Commission publicly reprimanded Judge Scott for his public criticism of other county officials. Judge Scott challenged the Commission's decision in federal court.[3] *Id.* at 205.

■ In evaluating the judge's claims of protection under the First Amendment, the court applied the two-step inquiry used in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to address the free speech rights of governmental employees. *Scott*, 910 F.2d at 210–211. The first step asks, in light of the content, form and context of the speech in question, whether the speech addresses a matter of legitimate public concern. *Id.* at 210. If it does not, the inquiry ends. *Id.* If the speech does address public concerns, the court must then balance the individual's first amendment rights against the governmental employer's countervailing interest in promoting efficient performance of its functions. *Id.* at 211. The court ruled that Judge Scott could not be disciplined because his letter addressed matters of "legitimate public concern" and no countervailing State interest outweighed his right to engage in protected speech. *Id.* at 211–13.

Did Judge Davis's comments to the media address a matter of legitimate public concern? We hold that they did not. High courts repeatedly caution judges about confusing offenses to the judge's personal sensibilities with obstruction to the administration of justice. *Bell*, 894 S.W.2d at 127. Judge Davis was pursuing retaliatory action against a prosecutor whom he perceived had challenged his authority, even though he had removed any threat to the order in question by having the unserved warrant recalled. The retaliation assumed the dimension of a personal vendetta after the warrant had been suspended. This was not a situation in which a judge "spoke out concerning the administration of the courts, docket-management or funding disputes." *See In re Lowery*, 999 S.W.2d 639, 658 (Tex.Rev.Trib.1998, appeal denied). This was not about a flaw in the administration of justice, such as Judge Scott sought to publicize. *See Scott*, 910 F.2d at 204. Judge Davis did not attempt to bring notoriety to a police officer who was abusing the system by his consistent perjury in all cases of a similar nature before the court, as in *Jimenez*, 841 S.W.2d at 574–75. Instead, Judge Davis commented that first Laura Cass, and later Bill Turner, were guilty of "undermining" the authority of one judge who was overly sensitive to criticism. Judge Davis did not contact the media regarding a matter concerning the public administration of

---

3. He presented his challenge as a section 1983 action in federal court because at the time, state law did not provide for any appeal of a sanction imposed by the Commission. In 1987, the appeal provision was added to the government code. *See* Act of July 20, 1987, 70th Leg., 2d C.S., ch. 47, § 2, 1987 Tex. Gen. Laws 143, 143–44.

justice but about a matter concerning one judge's personal sensibilities. Unlike Judge Scott, Judge Davis was speaking out primarily to promote a private interest of retaliation. Furthermore, by going to the media with this dispute, Judge Davis used the prestige of his office to attempt to manipulate the personnel decisions in the DA's office, a matter beyond his authority. This was done to advance the judge's own private interest, to remove a "sneaky and surreptitious" prosecutor who was making each day on the bench "a drudgery" for him. Based on a preponderance of the credible evidence, we hold that Judge Davis did not go to the press to inform the public about a matter of legitimate public concern. This distinguishes his case from that of Judge Scott and Judge Jimenez, and causes us to reject the *Scott* rationale that the First Amendment bars the Commission from imposing a sanction for Judge Davis's actions in going to the media with this dispute.

█ Also relying on the First Amendment, Judge Davis attempted to explain his most offensive letter to Bill Turner, undated but probably written on May 2, 2001, as a theological rebuke to a personal friend who shared his faith. Mr. Turner testified that he viewed the judge's letter as an unwelcome and offensive diatribe, and further disputed that he and the judge were close, spiritually or otherwise. Judge Davis continued to assert to this special court that because the letter was a private expression of his religious views, it is not sanctionable. We find that the letter did not principally address spiritual and personal matters between friends but was focused almost entirely on the professional relationship between the 272nd district court and the district attorney's office. Judge Davis cannot shield his actions from sanction by couching his attack on Bill Turner and Laura Cass in religious

terms. The terms Judge Davis used to "rebuke" the district attorney shock the conscience. Such profane language, distasteful and inappropriate for a judge to use in any professional relationship, does not promote public regard for the judiciary. Judge Davis has cloaked his rebuke of the district attorney in theological terms, but he is being sanctioned not for his religious beliefs but for his failure to live up to the ethical standards of conduct required of a judge. In coming to our conclusion, we disregard all of the inquires into the judge's religious beliefs and measure his behavior solely by the standards of the Code of Judicial Conduct.

We reject the First Amendment defenses asserted by Judge Davis and hold that they pose no bar to the sanction imposed by the Commission.

## CONCLUSION

We affirm the public reprimand issued by the Commission. Because of Judge Davis's persistent refusal to acknowledge the serious ethical violations he has committed, we have considered the Commission's alternative request that we refer this judge for formal proceedings of removal. However, we are not charged with punishing but with providing guidance to judges and protection to the public. *See* Tex. Code Jud. Conduct, Canon 8 (Code is not designed or intended as a basis for civil liability or criminal prosecution but rather to provide guidance to judges and structure for the regulation of judicial conduct). We choose to hope that this unpleasant affair will cause this obviously talented judge to be less mindful of criticism and more mindful of his ethical obligations. We nevertheless think that the flagrant nature of the judge's behavior warrants an additional sanction. We first considered referring Judge Davis for judicial education in assuming the role of a judge, but

found that he has twice attended the College for New Judges. To provide the guidance that he did not take from those classes, we order Judge Davis to obtain eight hours of instruction with a mentor judge, in addition to his required judicial education. In particular, Judge Davis is to seek instruction in anger management, courtroom demeanor, dealing with the media, and responding appropriately to criticism.

Judge Davis is directed to contact the State Commission on Judicial Conduct within two weeks of this decision to obtain the name of the mentor judge who will confer with him regarding this recommended instruction. Judge Davis is to complete his instruction with his mentor judge within ninety days from the date of this opinion. We are hopeful that even after completing this instruction, Judge Davis will continue to call upon his mentor judge for counsel before taking actions that might be questionable under the Code. The mentor judge shall file with the Commission the details of the instruction received by Judge Davis and notice that he has successfully complied with this sanction.