### In re Honorable James Patrick "Jim" SHARP, Jr.

### No. 12–0003.

Special Court of Review Appointed by the Supreme Court.

March 13, 2013.

---

## OPINION

### I. Introduction

Justice MEIER delivered the opinion of the Multidistrict Litigation Panel, in which Justice BRIDGES and Justice MYERS joined.

Over the course of several hours during the evening of January 17, 2012, Petitioner Honorable James Patrick "Jim" Sharp, Jr., a justice on the First Court of Appeals in Houston, contacted or spoke to three individuals associated with the Brazoria County Juvenile Detention Center, a local District Judge, and a Brazoria County Commissioner in an effort to secure the release of an acquaintance's daughter, who was being held at the Juvenile Center overnight.[1] [Exs. 3, 4, 5, 11: 076, 12: 12–42] In light of Justice Sharp's conduct that night, the Brazoria County District Attorney filed a complaint with the State Commission on Judicial Conduct, which performed an investigation, acquired Justice Sharp's written response to a letter of inquiry, and conducted an informal hearing at which Justice Sharp testified. [Exs. 8, 11, 12] On August 30, 2012, the Commission publicly reprimanded Justice Sharp for violating Canons 2B, 4A(1), and 4A(2) of the Texas Code of Judicial Conduct and article V, section 1–a(6)A of the Constitution of the State of Texas. *See* Tex. Const. art. V, § 1–a(6)A; Tex.Code Jud. Conduct, Canons 2B, 4A(1), 4A(2), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. B (West 2005 & Supp.2012). [Ex. 13]

Thereafter, Justice Sharp initiated a review of the Commission's decision; the Chief Justice of the Supreme Court of Texas appointed this Special Court of Review; and the Commission's Examiners charged Justice Sharp with violating Code of Judicial Conduct Canons 2B, 3B(4), 4A(1), and 4A(2) and article V, section 1–a(6)A of the Texas constitution.[2] *See* Tex. Gov't Code Ann. § 33.034(a)–(d) (West Supp.2012); Tex.R. Rem'l/Ret Judges. 9(a)–(b). This Special Court of Review convened a trial de novo on January 14, 2013—Justice Sharp stipulated to the ad-

---

1. Justice Sharp testified that he also tried to call an attorney, Jimmy Phillips, and called former State Representative and Judge Neil Caldwell. [Ex. 12: 41] There is no evidence that he actually spoke with either person.

2. The Special Court of Review consists of The Honorable Bill Meier, Justice, Court of Appeals, Second District of Texas at Fort Worth, presiding by appointment; The Honorable Lana Myers, Justice, Court of Appeals, Fifth District of Texas at Dallas, participating by appointment; and The Honorable David Bridges, Justice, Court of Appeals, Fifth District of Texas at Dallas, participating by appointment.

mission of the Examiners' exhibits, including the transcript of the informal hearing previously conducted by the Commission, and Stephen A. Tew, M.D. and Justice Sharp testified. *See* Tex. Gov't Code Ann. § 33.034(e); (h); Tex.R. Rem'l/Ret. Judges 9(c). [1/14 Trial: 6, 13, 36, 74] Having considered the pleadings, all of the evidence, the arguments of counsel, and the post-trial briefs, the Special Court of Review timely issues this decision and directs its publication. *See* Tex. Gov't Code Ann. § 33.034(h); Tex.R. Rem'l/Ret. Judges 9(d), (e)(2).

## II. RELEVANT STANDARDS AND BURDEN OF PROOF

The Texas constitution provides that a judge may be disciplined for a willful violation of the Code of Judicial Conduct or for willful or persistent conduct that is clearly inconsistent with the proper performance of his or her duties or that casts public discredit upon the judiciary or administration of justice. Tex. Const. art. V, § 1–a(6)A. For purposes of article V, section 1–a, "willful or persistent conduct that is clearly inconsistent with the proper performance of" a judge's duties includes a willful violation of a provision of the Code of Judicial Conduct. Tex. Gov't Code Ann. § 33.001(b)(2) (West Supp.2012).

 Willful conduct requires a showing of intentional or grossly indifferent misuse of judicial office, involving more than an error of judgment or lack of diligence. *In re Davis*, 82 S.W.3d 140, 148 (Tex.Spec.Ct.Rev.2002); *In re Bell*, 894 S.W.2d 119, 126 (Tex.Spec.Ct.Rev.1995). A judge need not have specifically intended to violate the Code of Judicial Conduct; a willful violation occurs if the judge intended to engage in the conduct for which he or she is disciplined. *Davis*, 82 S.W.3d at 148; *In re Barr*, 13 S.W.3d 525, 539 (Tex.Rev.Trib.1998).

As this review is governed to the extent practicable by the rules of law, evidence, and procedure that apply to the trial of a civil action, the Examiners had the burden to prove the charges against Justice Sharp by a preponderance of the evidence. *See* Tex. Gov't Code Ann. § 33.034(f); *In re Hecht*, 213 S.W.3d 547, 560 (Tex. Spec.Ct.Rev.2006); *Davis*, 82 S.W.3d at 142.

## III. CHARGE I—CANON 2B

The Examiners charged Justice Sharp in Charge 1 with violating the following parts of Canon 2B: "A judge shall not allow any relationship to influence judicial conduct or judgment, A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others." Tex.Code Jud. Conduct, Canon 2B. [Ex. 14]

### A. Lending Prestige of Judicial Office

The evidence demonstrates that an acquaintance of Justice Sharp contacted him sometime between 7:00 and 7:30 p.m. on the evening of January 17, 2012, told him that her daughter had been arrested for shoplifting several items from a department store, and expressed concern that her daughter was being held overnight at the Juvenile Center. [Exs. 11: 076, 12: 15, 17] Justice Sharp called the Juvenile Center multiple times over the course of several hours that same night and spoke to Corey Davis and Rene Munoz, Juvenile Center employees, and to Chad-Ward, the Assistant Director of Juvenile Probation. [Exs. 3, 4, 5, 11: 77–78, 12: 17] Davis, Munoz, and Ward all recounted that Justice Sharp identified himself as a judge on the court of appeals and either demanded that the juvenile be released or inquired about what needed to be done to secure her release. [Exs. 3, 4, 5] According to Davis, after he informed Justice Sharp

that the juvenile could not be released that night because she had been arrested on a Class B theft charge, Justice Sharp stated in an angry tone, "[D]o you know who your [sic] talking to, you better release her tonight!" [Ex. 4] According to Munoz, he received a phone call from a person "claiming to be Justice John [sic] Sharp from the Court of Appeals." [Ex. 5] Munoz recounted in his statement that Justice Sharp explained "his role in the judicial organizational chart, stating he was over 10 counties." [Ex. 5] Likewise, according to Ward, who also notified Justice Sharp that the juvenile would not be released until the morning, Justice Sharp told him, "I am a judge in the Court of Appeals. I have authority over your judges along with every judge in ten other counties in this area." [Ex. 3] Ward also recalled that Justice Sharp had told him that he had messaged Brazoria County Commissioner Donald "Dude" Payne and proclaimed, "You'll have picked the wrong little girl that has friends in high places to mess with." [Ex. 3]

At some point between conversations with the Juvenile Center, Justice Sharp left a voicemail with and sent a text message to Commissioner Payne. [Ex. 12; 29–36] In the voicemail, Justice Sharp identified himself, said that his friend's daughter "got popped" for shoplifting, and asked for Commissioner Payne's help because he "probably know[s] who to call to make the keys go open." [1/14 Trial: 100–01] Justice Sharp explained to Commissioner Payne, "There's just really no sense in having a 15–year–old girl in jail tonight in the Brazoria Juvi lockup." [1/14 Trial: 101] In his text message to Commissioner Payne, Justice Sharp stated, "You don't release 15 y[ear] olds accused of simple shoplifting . . . on the request of an Appeals Ct justice? Serious problems there, Dude." [Ex. 2]

At some point the same night, Justice Sharp also left a voicemail with and sent text messages to District Court Judge Ben Hardin. [Ex. 12: 35–39] Justice Sharp said that his friend's fifteen-year-old daughter had been arrested and was at the Juvenile Center and that he was "hoping it's just as easy for you to make a call and say 'Let the gal loose.[']" [1/14 Trial: 102] Justice Sharp said, "So if you can—on your—your verbal authority, get that done, I would, you know—you know, there's a lot of things I'll do, and none of those things are wrong." [1/14 Trial: 102] In a text message to Judge Hardin, Justice Sharp wrote, "Brazoria County Juvie folks are n[o]t just arrogant but ignorant. When an Appeals Court Justice calls and identifies himself and they then refer to me as "Mr" Sharp, it bespeaks a fundamental misunderstanding of respect and pecking order!" [Exs. 6, 12: 37–38]

■ Justice Sharp acknowledged at trial that he repeatedly invoked his judicial title in his communications over the course of the evening and confirmed on several occasions that his goal was to secure the juvenile's release that night. [1/14 Trial: 82, 88; Exs. 11: 78–79, 12: 76] Although he explained that he invoked his judicial title to ensure that the person he was speaking with knew that he was part of the justice system and not some "Joe Schmo down the street," Justice Sharp conceded that his conduct could have been interpreted differently. [1/14 Trial: 82–83] Justice Sharp testified that he did not intend to lend the prestige of his judicial office to advance the private interest of his acquaintance, but this alone is not dispositive of our inquiry; the evidence shows that Justice Sharp intended to engage in the communications detailed above. *See Davis,* 82 S.W.3d at 148; *Barr,* 13 S.W.3d at 539.

Accordingly, we find that the Examiners established by a preponderance of the evi-

dence that Justice Sharp willfully violated Canon 2B by lending the prestige of his judicial office during his effort to secure the release of his acquaintance's daughter from the Juvenile Center. · See Tex.Code Jud. Conduct, Canon 2B.

**B. Allowing Relationship to Influence Judicial Conduct**

Justice Sharp mentioned in both voicemails that the daughter of his "friend" had been arrested. [1/14 Trial: 100–01] He explained that he had met the juvenile's mother because of her involvement in Brazoria County politics and that he knew the juvenile's grandmother, who was the chairman of the Brazoria County Democratic Party. [1/14 Trial: 92–93] Justice Sharp offered to go to the Juvenile Center to act as the magistrate for his acquaintance's daughter, but he did not offer to act as the magistrate for, nor otherwise secure the release of, any other juveniles. [Exs. 3, 12:44]

■ Justice Sharp argues that we should not find a violation of this part of Canon 2B because there is no evidence that his relationship with the juvenile's mother affected his *judicial* conduct or judgment, an express requirement of Canon 2B. [Sharp Br. 2] However, as we have detailed, Justice Sharp repeatedly identified himself as a member of the court of appeals, exclaimed that he had authority over judges in multiple counties, and even offered to drive to the Juvenile Center to act as the magistrate for the juvenile. [Exs. 3, 4, 5] Indeed, Justice Sharp's conduct was such that Davis wrote in his statement that Justice Sharp called at 8:00 p.m. "representing the court of appeals," and Ward claimed that Justice Sharp told him, "Well if what you're needing is a Judge to sign an order, I can do that. What do you want me to do, get in my car and drive down there because I will do it." [Exs. 3, 4] We therefore conclude that

Justice Sharp exercised, or purported to exercise, judicial conduct throughout his efforts to secure the juvenile's release.

■ Accordingly, we find that the Examiners established by a preponderance of the evidence that Justice Sharp willfully violated Canon 2B by allowing his relationship with the juvenile's mother to influence the judicial conduct or judgment that he exercised while attempting to secure the juvenile's release from the Juvenile Center. See Tex.Code Jud. Conduct, Canon 2B.

## IV. Charge II—Canon 3B(4)

■ The Examiners charged Justice Sharp in Charge II with violating the following part of Canon 3B(4): "A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." Tex.Code Jud. Conduct, Canon 3B(4). [Ex. 14] ·· ·

Ward recalled that Justice Sharp told him, "You guys are a bunch of back woods hillbillies that use screwed up methods in dealing with children and I can promise you this, things are about to change in Brazoria County." [Ex. 3] Both Davis and Munoz described Justice Sharp as becoming upset during the course of their conversations with him. [Exs. 4, 5] In his voicemail left with Commissioner Payne, Justice Sharp said, "I talked to some guy named Davis who was the most arrogant little prick I've ever talked to in my life. He said I was rude." [1/14 Trial: 100–01] In his voicemail left with Judge Hardin, Justice Sharp said that he had "talked to some ... guy named Officer Davis, who said I was being rude and had an attitude. And, you know, if I had been there in person and had a baseball bat, that sonofabitch would have been cracked upside the head. I mean, f[- - -] that little cocksucker." [1/14 Trial: 101–02] In text messages

to Judge Hardin, Justice Sharp described Davis as a "county paycheck functionary," said that it was "totally unacceptable" that Davis called him "rude," and referred to Davis as a "stupid asshole" who "need[s to] find [a] new job that never has him communicating with appellate court justices. Had I been there personally, it would have been damn ugly for him." [Ex. 6]

Justice Sharp acknowledged that he left the voicemails, sent the text messages, and "said all these things and ... made these calls." [Exs. 11, 12: 31, 34, 35, 36, 37; 1/14 Trial: 107] Although he testified that he did not intend to carry out any physical violence—he was just "venting"—Justice Sharp admitted that his anger escalated as the night progressed and that he understood how his threats could have been construed differently. [1/14 Trial: 75–76, 81–82; Ex. 12: 38–39] And while he never intended for his profane language to reach the public domain, Justice Sharp agreed that his actions were not courteous, polite, nor dignified. [1/14 Trial: 84]

Justice Sharp argues that we should not find a violation of Canon 3B(4) because it was never presented to the Commission. [Sharp Br. 4] Although the Commission did not conclude that Justice Sharp violated Canon 3B(4), the government code allowed the Commission to include "any additional charges to be considered by the court of review" when it filed the charging document within fifteen days after the appointment of the Special Court of Review. See Tex. Gov't Code Ann. § 33.034(d).

Justice Sharp additionally argues that there is no evidence that he acted in an official capacity. [Sharp Br. 3–4] This is the same argument that he raised regarding whether he engaged in judicial conduct or judgment under Canon 2B, and we reject it for the same reasons.

Accordingly, we find that the Examiners established by a preponderance of the evidence that Justice Sharp willfully violated Canon 3B(4) by making profane, demeaning, and threatening statements either to or about Juvenile Center employees while acting in an official capacity. See Tex. Code Jud. Conduct, Canon 3B(4).

## V. CHARGES III AND IV—CANONS 4A(1) AND 4A(2)

The Examiners charged Justice Sharp in Charges III and IV with violating Canons 4A(1) and 4A(2), which provide as follows:

A judge shall conduct all of the judge's extra-judicial activities so that they do not:

(1) cast reasonable doubt on the judge's capacity to act impartially as a judge; or

(2) interfere with the proper performance of judicial duties.

Tex.Code Jud. Conduct, Canons 4A(1), (2). Justice Sharp argues that there would be an inconsistency if in addition to finding a violation of the part of Canon 2B that prohibits a judge from allowing any relationship to influence *judicial* conduct or judgment, we also—relying on the same underlying conduct—find a violation of Canons 4A(1) and 4A(2), which implicate only *extra-judicial* activities. [Sharp Br. 2–3] Similarly, Justice Sharp argues that if we find a violation of Canon 3B(4), which involves only a judge's *official-capacity* conduct, then we should not rely on the same underlying conduct to find violations of Canons 4A(1) and 4A(2), which, again, relate only to *extra-judicial* activities. [Sharp Br. 4] We agree. Having determined that Justice Sharp, in violating Canons 2B and 3B(4), engaged in judicial conduct and acted in an official capacity during his efforts to secure the juvenile's release, we cannot rely on that same underlying conduct, as part of our inquiry

into whether he violated Canons 4A(1) and 4A(2), to (irreconcilably) conclude that Justice Sharp instead engaged in extra-judicial activity. Simply put, we do not see, nor do the Examiners attempt to explain, how Justice Sharp could have simultaneously engaged in both judicial and extra-judicial conduct.

Accordingly, as charged in Charges III and IV, we decline to find that Justice Sharp violated Canons 4A(1) and 4A(2).

## VI. CHARGE V—ARTICLE V, SECTION 1-A(6)A

The Examiners charged in Charge V that Justice Sharp's "willful and/or persistent conduct on the evening of January 17, 2012, was the focus of negative media attention, which cast public discredit upon the judiciary or administration of justice, in violation of" article V, section 1-a(6)A of the Texas constitution. *See* Tex. Const. art. V, § 1-a(6)A.

The evidence demonstrates that after the Brazoria County District Attorney filed a motion to recuse Justice Sharp from an appeal pending before the First Court of Appeals, due to his conduct of January 17, 2012, the *Houston Chronicle* published a "very critical" article that detailed the same, or substantially the same, conduct underlying the district attorney's motion to recuse. [Ex. 8: 37; 1/14 Trial: 105–06] Similar articles appeared in a Brazoria County newspaper and the *Texas Lawyer.* [1/14 Trial: 105–06] Justice Sharp acknowledged that he was "mortified and embarrassed and remorseful" about his conduct and that he could see how his conduct reflected poorly on the judiciary. [1/14 Trial: 75, 88] The following exchange occurred at trial:

[Examiner]: But the problem is that the public, long before this hearing today and before even the hearing before the Commission[,] was aware of your actions, your conduct, your words, whether they were threats or as you called them just comments.

[Justice Sharp]: They had run in the paper some of it, yes, sir.

[Examiner]: And it's not just that it's a reflection on you and it's not just that it's a reflection on the Court, but it [is] a reflection on our system of justice, isn't it?

[Justice Sharp]: Yes, sir. And I'm embarrassed about that, and 1 apologize. This was not a good night for me, Counsel. [1/14 Trial: 106–07]

■ Justice Sharp makes a causation argument based on the specific wording used by the Examiners in Charge V, arguing that the allegation did not focus on whether *his* conduct, standing alone, cast public discredit upon the judiciary but, instead, charged that his conduct caused *negative media attention*, which had the effect of casting public discredit upon the judiciary. [Sharp Br. 6–7] The argument is untenable—although the media attention was the conduit by which Justice Sharp's conduct was publicized, the media attention itself could not have cast public discredit upon the judiciary; rather, Justice Sharp's *conduct*, which was the subject of the media attention, cast public discredit upon the judiciary. Justice Sharp acknowledged this at trial. [1/14 Trial: 106–07] We find that Charge V was sufficient to give Justice Sharp fair notice that the Examiners were relying on his conduct of January 17, 2012, to support a violation of the Texas constitution.

■ Justice Sharp also argues that we should not find a violation of the Texas constitution because *he* did not publicize his conduct of January 17, 2012; the Brazoria County District Attorney initially did so. [Sharp Br. 6–7] Justice Sharp directs us to *Davis*, in which the special court of

review there concluded that Judge Davis cast public discredit on the judiciary and created a lack of confidence in the administration of justice "by publicly airing his retaliatory rhetoric and by using the press to try to pressure the DA to remove a prosecutor" from his courtroom. *See Davis*, 82 S.W.3d at 148. In construing the Texas constitution, our objective is to determine and give effect to "the intent of the makers and adopters of the provision in question," and we rely heavily on the literal text. *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex.2009). The text of the constitutional provision at issue here provides that a judge may be disciplined for "willful or persistent conduct that ... casts public discredit upon the judiciary or administration of justice." Tex. Const, art. V, § 1–a(6)A. Thus, the constitution's textual focus is on condemning a particular form of willful or persistent judicial *conduct*—that which casts public discredit upon the judiciary or administration of justice. It does not elaborate about the manner or means by which the conduct *becomes* public. Article V, section 1–a(6)A's text therefore implicates not only complained-of conduct made public by a judge, like in *Davis*, but also complained-of conduct made public by someone other than the judge, as occurred here. *See, e.g., In re Canales*, 113 S.W.3d 56, 62–63, 69–70 (Tex.Rev.Trib.2003, pet.denied) (holding that the evidence was legally and factually sufficient to support the Commission's finding that judge's misconduct cast public discredit upon the judiciary or administration of justice but not articulating that judge himself brought the misconduct to the attention of the public); *Matter of Carrillo*, 542 S.W.2d 105, 110 (Tex.1976) (finding that misconduct constituted willful conduct that cast

public discredit upon the judiciary but not articulating that judge himself brought the misconduct to the attention of the public).

■ Accordingly, we find that the Examiners established by a preponderance of the evidence that Justice Sharp engaged in willful conduct that cast public discredit upon the judiciary or administration of justice in violation of article V, section 1–a(6)A of the Texas constitution. *See* Tex. Const. art. V, § 1–a(6)A.

## VII. DISCIPLINE

Having found that Justice Sharp violated Canons 2B and 3B(4) and article V, section 1–a(6)A of the Texas constitution, we must now determine an appropriate degree of discipline to impose against Justice Sharp. *See* Tex.R. Rem'l/Ret. Judges 9(d). The Examiners contend that we should, at a minimum, issue a public reprimand. [Examiners' Br. 14; Rebuttal Br. 5] Justice Sharp argues that we should issue a sanction less severe than a public reprimand, such as a private sanction or, at a maximum, a public warning or admonition.[3] [Sharp Br. 8, 15]

**A. Relevant Standards and Factors and Justice Sharp's Contentions and Arguments**

### 1. Purpose of Sanctions and Factors

One tribunal has described the purpose for imposing sanctions as follows:

The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be

---

3. Justice Sharp candidly testified that he will be ineligible to sit as a visiting judge if he is

publicly reprimanded. [1/14 Trial: 107–08]

designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future.

*Barr,* 13 S.W.3d at 560 (quoting *In re Kneifl,* 217 Neb. 472, 351 N.W.2d 693, 700 (1984)). Our Code of Judicial Conduct provides that the discipline imposed "should depend on such factors as the seriousness of the transgression, whether there is a pattern of improper activity[,] and the effect of the improper activity on others or on the judicial system." Tex. Code Jud. Conduct, Canon 8A. Additionally, both the Examiners and Justice Sharp direct us to the *"Deming* factors," which several courts have considered in determining an appropriate sanction:

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

*Matter of Deming,* 108 Wash.2d 82, 736 P.2d 639, 659 (1987); *see In re Rose,* 144 S.W.3d 661, 733 (Tex.Rev.Trib.2004). [Sharp Br. 9; Examiners' Br. 2; Rebuttal Br. 3]

### 2. Dr. Tew's Testimony

Justice Sharp argues that the testimony of Dr. Tew, which the Commission did not have the opportunity to consider, mitigates in favor of a sanction less severe than a public reprimand. [Sharp Br. 10–11] Dr. Tew is a Houston psychiatrist who evaluated Justice Sharp in December 2012 and referred him for neuropsychologic testing and a complete neurologic evaluation and electroencephalogram. [1/14 Trial: 36, 39–40] Dr. Tew testified that, in light of the results of the testing and further evaluation, Justice Sharp has adult Attention Deficit Disorder (ADD). [1/14 Trial: 40] Dr. Tew elaborated about the condition as follows:

The fact that he has a diagnoseable illness and the characteristics of the illness are very common; explosive temper is one of those, the inability to kind of foresee the consequences of one's actions, having a very short fuse, getting easily angered, easily frustrated, and the inability to sort of let go of a situation and step back and rethink it. These are all common and typical characteristics of untreated attention deficit disorder.

. . . .

Let me state that the problem with attention deficit disorder isn't a lack of attention, but you might say an inappropriate attention to often inappropriate details. [1/14 Trial: 52, 41]

Dr. Tew reviewed much of the same evidence that we have detailed above and opined that Justice Sharp's ADD was a very significant factor in his conduct on January 17, 2012, and that he did not have the ability to understand the consequences of his conduct. [1/14 Trial: 42–43] Dr. Tew described Justice Sharp's ADD as a "very treatable illness" and explained that with medication and counseling, it was "highly unlikely" that an incident similar to what occurred on January 17, 2012, would hap-

pen again. [1/14 Trial: 44] But Dr. Tew also agreed that ADD "doesn't totally control" a patient's conduct. [1/14 Trial: 56]

### 3. Desk and Identification Badge Incidents

 Justice Sharp argues that our analysis should not consider two other incidents in which he was involved because they were not included in the charging document and they occurred before his diagnosis of ADD. [Sharp Br. 11–12]

One incident involved Justice Sharp's office desk. [Ex. 12: 50–62] The court of appeals was moving its offices to a new location, and after county officials told Justice Sharp that they would not move his desk from the old offices to the new offices (because new furniture would be used), he recruited twenty-five or thirty people one evening to help him move the desk to the new offices. [Ex. 12: 52–56; 1/14 Trial: 115] At some point thereafter, when Justice Sharp returned to his chambers, the desk was gone, and he filed a police report claiming that the desk had been stolen. [Ex. 12: 59–60] Justice Sharp explained that he moved the desk because it had a history and should have "stay[ed] with the court," but he acknowledged that the desk did not belong to him and that no other judge had been permitted to move his or her desk to the new offices. [Ex. 12: 57–58, 59, 73] A July 2011 newspaper article detailed Justice Sharp's frustration with Harris County's decision to use new furniture and contained a photograph of Justice Sharp standing on top of the old desk with his arms outstretched at his sides. [Ex. 8: 043] Another newspaper article, from September 2011, said that Justice Sharp "had some longshoremen buddies smuggle [the desk] across town Monday night, against the orders of Harris County Commissioners Court." [Ex. 8: 041]

In the other incident, Justice Sharp periodically refused to show his identification badge to security personnel when bypassing the metal detectors at the building where the court of appeals is located. [Ex. 12: 61–68] He felt that requiring him to show his identification badge was "silly harassment" because the security personnel knew who he was. [Ex. 12: 65–67] In an October 2011 memorandum addressed to Justice Sharp, the Director of Facilities and Property Management wrote that he had been "presented confirmed reports that you [Justice Sharp] have acted in an extremely belligerent manner and conducted yourself in a manner unfitting for a person of your stature. Your actions … have included the use of profanity directed toward the County's contractors charged with the responsibility of conducting the required screening procedures." [Ex. 8: 047] The Director continued, "Judge Sharp, your refusal to accept and comply with the regulations promulgated by the Commissioners Court of Harris County, designed to protect the safety of the public and of the employees who work in County facilities, is extremely troublesome to me and many other Harris County officials." [Ex. 8: 047]

### 4. Justice Sharp's Contentions Regarding the Brazoria County Juvenile Center's Policies

Justice Sharp contends that the Juvenile Center did not comply with the law. [Sharp Br. 12–13] He directs us to family code section 53.02, which provides that "[i]f a child is … delivered to a detention facility as authorized by Sections 51.12(a)(3) and (4), the intake or other authorized officer of the court shall immediately make an investigation and shall release the child unless it appears that his detention is warranted" under an exception listed in section 53.02(b). *See* Tex. Fam.Code Ann. § 53.02(a), (b) (West

2008). [Sharp Br. 14] Justice Sharp contends that the Juvenile Center should have released the juvenile to her mother because none of the exceptions listed in section 53.02(b) applied. [Sharp Br. 14] He gives the following explanation for raising this argument: "While the lawfulness (or not) of Brazoria County's juvenile detention policy does not negate or excuse [his] behavior, it should certainly be taken into consideration *in determining the proper punishment.*"[4] [Emphasis added.] [Sharp Br. 12]

### 5. Other Judicial Conduct Cases

Justice Sharp directs us to a few other actions involving extrajudicial conduct that received negative attention, but the Commission issued a lesser sanction than a public reprimand. *See, e.g., In re Adams,* CJC No. 12–0217–CC (Tex. Comm'n Jud. Conduct 2013). [Sharp Br. 15] Referencing public reprimands in 2011, 2006, 2005, and 2004, albeit without any citation, the Examiners respond that it is not unusual for the Commission to issue a public reprimand, particularly for the type of conduct in which Justice Sharp engaged. [Rebuttal Br. 3–4]

### B. Public Reprimand is the Appropriate Sanction

■ Although several *Deming* factors weigh in favor of imposing a sanction less severe than a public reprimand, including factors (e) (whether the judge has acknowledged or recognized that the acts occurred) and (f) (whether the judge has evidenced an effort to change or modify his conduct), other factors weigh significantly more heavily in favor of imposing a public reprimand, especially factors (i) (the effect the misconduct has upon the integri-

ty of and respect for the judiciary) and (j) (the extent to which the judge exploited his position to satisfy his personal desires).

While the Commission did not have the opportunity to consider Dr. Tew's testimony regarding Justice Sharp's ADD, in light of the nature and severity of Justice Sharp's violations, we are not convinced that Dr. Tew's opinions militate in favor of a sanction other than a public reprimand. We do, however, hope that Justice Sharp will continue to pursue treatment with Dr. Tew or another treatment provider.

None of the charges rely upon evidence of the desk and identification badge incidents to demonstrate that Justice Sharp violated the Code of Judicial Conduct or the Texas constitution, nor do our analyses of the various charges, but we disagree with Justice Sharp that we may not consider any evidence of those incidents in determining an appropriate sanction because both Canon 8A and *Deming* factor (a) expressly speak of patterns of misconduct or improper activity. *See* Tex.Code Jud. Conduct, Canon 8A; *Deming,* 736 P.2d at 659. Justice Sharp's actions on January 17, 2012, and the evidence of the desk and identification badge incidents establish a course of conduct that is unbecoming of a Texas judge—that is, on several occasions, Justice Sharp has unambiguously expressed contempt, in one form another, for some entity (or the entity's employees)—be it the Juvenile Center or Harris County—because he personally disagreed with some rule or procedure or decision being enforced by that entity. This pattern of behavior is fundamentally inconsistent with the high standards by which a judge must conduct himself.

Further, we decline to afford much, if any, weight to Justice Sharp's contention

---

4. We do not accept Justice Sharp's contention that the Juvenile Center failed to comply with family code section 53.02(a).

that we should issue a sanction less severe than a public reprimand due to his opinion that the Juvenile Center did not comply with the family code. Our primary focus in this proceeding is Justice Sharp's conduct on January 17, 2012—detailed at length above—not his contentions regarding the family code.

Accordingly, to preserve the integrity and independence of the judiciary, to restore and reaffirm public confidence in the administration of justice, and in recognition that judges must respect and honor the judicial office as a public trust, we conclude that a public reprimand is appropriate. Therefore, after considering the pleadings, all of the evidence, the arguments of counsel, and the parties' post-trial briefing, we will issue a public reprimand against Justice Sharp for his violations of the Code of Judicial Conduct and the Texas constitution.

## VIII. CONCLUSION

We find that Justice Sharp willfully violated Canons 2B and 3B(4) of the Code of Judicial Conduct and article V, section 1–a(6)A of the Texas constitution. We issue the following sanction against Justice Sharp for those violations: **Public Reprimand.**

## JUDGMENT AND PUBLIC REPRIMAND

The Special Court of Review has considered the pleadings, all of the evidence, the arguments of counsel, and the parties' post-trial briefing and finds that the Honorable James Patrick "Jim" Sharp, Jr. willfully violated Canons 2B and 3B(4) of the Texas Code of Judicial Conduct and article V, section 1–a(6)A of the Constitution of the State of Texas. Accordingly, the Special Court of Review issues a **Public Rep-**rimand of the Honorable James Patrick "Jim" Sharp, Jr. for said violations.